Present:  All the Justices

MARK A. SHEPPARD

OPINION BY JUSTICE A. CHRISTIAN COMPTON

v.  Record Nos. 950760                    November 3, 1995
    and 950761

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
William R. Shelton, Judge

On Sunday, November 28, 1993, Richard A. Rosenbluth and Rebecca W. Rosenbluth, his wife, were murdered in their Chesterfield County home.  The police discovered their bodies there two days later; multiple gunshot wounds were found in each body.  On December 3, 1993, near 5:00 a.m., defendant Mark A. Sheppard was arrested in Henrico County after he was apprehended while preparing to set fire to Mr. Rosenbluth's Nissan Pathfinder motor vehicle.

Subsequently, defendant, age 23, was charged in nine indictments as follows:  three indictments for capital murder, two indictments for robbery, and four indictments for using a firearm in the commission of a felony.  Two capital murder indictments were based upon allegations of killing the Rosenbluths during the commission of robbery.  Code § 18.2-31(4).  The third indictment for capital murder was based on the charge of killing Mr. Rosenbluth as part of the same act or transaction as the killing of Mrs. Rosenbluth.  Code § 18.2-31(7).

Prior to defendant's September 1994 trial, Andre L. Graham was tried on charges of capital murder for the same offenses and given a life sentence.  See Graham v. Commonwealth, 250 Va. ___,

___ S.E.2d ___ (1995), decided today.  Both men also were alleged to have committed other violent crimes recently in the Richmond Metropolitan Area.  See, e.g., Graham v. Commonwealth, 250 Va. 79, 459 S.E.2d 97 (1995).

Following a six-day trial, a jury found defendant guilty of all charges.  The jury fixed his punishment at 20 years' imprisonment on each of the robbery convictions and assessed a total of 18 years' imprisonment for the four firearm convictions.

After a separate sentencing proceeding on the capital murder convictions, the jury imposed two death sentences--one for killing each of the victims--based upon the vileness and future dangerousness predicates of the capital murder sentencing statute.  Code § 19.2-264.2.  Subsequently, the trial court considered a probation officer's report and, after a December 1994 hearing, sentenced defendant in accordance with the jury's verdicts.

The death sentences are before us for automatic review under Code § 17-110.1(A), see Rule 5:22, and we have consolidated this review with defendant's appeal of the capital murder convictions. Code § 17-110.1(F).  In addition, by order entered in April 1995, we have certified the appeals of the noncapital convictions from the Court of Appeals; the effect of the certification is to transfer jurisdiction over the noncapital appeals to this Court for all purposes.  Code § 17-116.06(A).  We have consolidated those appeals (Record No. 950761) with the appeal of the capital

murders (Record No. 950760).

The defendant does not assign error attacking the noncapital convictions. Additionally, he does not ask us to reverse those convictions. Therefore, we will make no further specific reference to the validity of those convictions, and they will be affirmed.

In accordance with settled principles of appellate review, we shall consider the facts relating to the capital murder convictions in the light most favorable to the Commonwealth, which prevailed below.

When the victims' bodies were discovered in their home on Tuesday, November 30, 1993, the house had been ransacked, but there was no sign of forced entry into the residence. Many items of the couple's jewelry and other personal property, including their two motor vehicles, were missing from the premises. The victims were last seen alive at their home on the previous Sunday morning.

The bodies were found in the den of the residence. Mr. Rosenbluth, age 40, had sustained two gunshot wounds from "close range." One gunshot entered the left eye and went into the cranial cavity causing damage to the spinal cord and the brain. The other gunshot entered the right side of the nose, went into the cranial cavity, and damaged the brain. Both wounds were lethal.

Mrs. Rosenbluth, age 35, had sustained four gunshot wounds

to the head and neck region, also from close range. All her wounds were "potentially lethal."

Expert testimony fixed the victims' time of death as between 24 to 48 hours prior to the discovery of their bodies. There was no evidence of any "struggle" by the victims "prior to the shots being fired." Autopsies revealed that the victims had ingested alcohol and cocaine within hours of their deaths.

Both of the husband's gunshot wounds and two of his wife's wounds were inflicted by a handgun that was linked to the defendant, a .38 caliber revolver. The wife's other two wounds were inflicted by a .45 caliber automatic handgun belonging to Andre Graham. That weapon was found in the apartment of Graham's girlfriend on December 3, the day Graham also was arrested after having driven defendant to the site where the Rosenbluths' Pathfinder vehicle was parked when defendant prepared to set fire to it. Defendant's .38 caliber revolver has not been recovered.

In addition to ballistics evidence, other evidence linked both defendant and Graham to the homicides. Defendant's fingerprint was identified on a package of razor blades found on the kitchen table in the victims' home when the bodies were discovered. Many of the surfaces at the crime scene had been "wiped clean" in an obvious effort by the assailants to "cover their tracks" and obliterate fingerprints.

Also, on Monday and Tuesday following the murders, defendant and Graham took the victims' two motor vehicles, the Pathfinder

and a Honda sedan, to two body shops for estimates on repainting the vehicles. On Wednesday, December 1, the Honda was found parked near the apartment of Graham's girlfriend. During the time after the murders and before his arrest, defendant had possession of the Pathfinder vehicle at the Henrico County home of his father, where defendant resided.

Additionally, during the period after the murders and before their arrests, defendant and Graham possessed numerous articles of the victims' personal property. Search of defendant's room at his father's house following the arrest produced the victims' stereo equipment, a piece of their luggage, and the license plates from the Pathfinder. When arrested, defendant possessed the wife's wrist watch and one of the husband's credit cards issued to his employer.

The evidence demonstrated that defendant and Graham were close friends involved in selling cocaine. Traces of cocaine, and drug paraphernalia, were found in the den and kitchen when the victims' bodies were discovered. The victims' personal records showed that, during the several months immediately preceding their deaths, the couple made substantial cash withdrawals and credit card charges averaging hundreds of dollars per day, apparently to support their addiction to the drug. Also, the husband used credit cards to provide hotel rooms for Graham in exchange for cocaine during that period.

The Commonwealth's theory of the case was that the defendant

and Graham regularly sold cocaine to the victims. During the weeks before the killings, it became increasingly apparent to these drug dealers that the victims' funds were being depleted rendering them unable to finance their habit. Finally, the victims were murdered either because of unpaid drug debts or because the assailants anticipated that, when the victims eventually were arrested for possessing illegal drugs, they would "point the finger" at defendant and Graham as their suppliers. The Commonwealth contended that, after the assailants entered the home to sell drugs to the victims, defendant shot the husband twice while Graham shot the wife twice, and that defendant fired two additional shots into the wife's head.

The defendant testified in his own defense, admitting he was present in the victims' home at the time of the murders, which he claimed occurred on Saturday, not Sunday. Defendant denied being present in the den when the victims were shot, testifing that he was "[i]nside the dining room sitting at the table" when the homicides took place, and that Graham and one Benji Vaughan, a friend of defendant and Graham, were in the den with the victims. Defendant admitted having been armed with a ".380 automatic" at the time of the shootings, and said he did not know the whereabouts on the day of trial of the .38 caliber revolver, which he owned previously.

On appeal, defendant assigns 28 alleged errors committed by the trial court. Defendant has engaged in the improper

procedural practice of altering the assignments of error between the time they were originally filed pursuant to Rule 5:22(b) and the time his appellate brief was filed. In this discussion, we shall refer only to the original assignments of error found in the appendix at pages 195-96.

The defendant has not briefed or argued four of those assigned errors (Nos. 1, 20, 21, and 25); thus, we will not consider them. Weeks v. Commonwealth, 248 Va. 460, 465, 450 S.E.2d 379, 383 (1994), cert. denied, ___ U.S. ___, ___ S.Ct. ___ (1995). The remaining assignments of error emphasized by the defendant present questions dealing with the trial court's removal of certain jurors for cause, the sufficiency of the evidence to show that the defendant was the perpetrator of the crimes, refusal of the trial court to advise the jury of the life sentence imposed upon Graham for these crimes, admission of evidence of unadjudicated crimes involving the defendant, and sufficiency of the evidence to support the vileness and future dangerousness predicates for the death sentences.

First, defendant contends the trial court improperly removed for cause four prospective jurors. The defendant procedurally defaulted the alleged improper exclusion of Winkfield F. Twyman because defendant failed to object at trial to his exclusion. Such a claim may not be raised on appeal for the first time. Rule 5:25.

The trial court excluded prospective jurors Dennis F.

Hasenfus and David Roberts based upon their voir dire responses indicating they would be unable to impose a death sentence.  For example, Hasenfus stated repeatedly he could not impose the death penalty unless the Commonwealth proved "beyond a shadow of a doubt" that such punishment was "necessary."  Roberts said, "I do not think that I could vote to give the death penalty.  I could not."

Prospective juror Deborah C. Pruitt had been summoned as a witness in a prior capital murder case tried in the court below in which the defendant had been sentenced to death.  She had not testified in the case.  During voir dire, she indicated that, although she had not heard any of the testimony in the prior case, she was not convinced the defendant in the prior case actually was guilty as charged.  Stating that Pruitt's views "are somewhat alarming to me," the trial court excluded her.

Upon appellate review, we give deference to the trial court's decision whether to exclude or retain a prospective juror because the trial court "sees and hears the juror;" accordingly, the trial court's ruling on this question will be disturbed only upon a showing of manifest error.  Eaton v. Commonwealth, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), cert. denied, 502 U.S. 824 (1991) (quoting Wainwright v. Witt, 469 U.S. 412, 426 (1985)); Bennett v. Commonwealth, 236 Va. 448, 469, 374 S.E.2d 303, 316 (1988), cert. denied, 490 U.S. 1028 (1989).  In the present case, we find no manifest error in the trial court's decision to

exclude Hasenfus, Roberts, and Pruitt.

Next, the defendant contends that the evidence was insufficient to sustain his convictions for capital murder. Defendant says he "does not contest the sufficiency of the evidence on which the robbery convictions were based;" he "does contest the sufficiency of evidence proving . . . that he was a triggerman in the murder of the Rosenbluths and . . . that their murders were committed in the course of a robbery." There is no merit to this contention.

The Commonwealth has the burden to prove beyond a reasonable doubt that one accused of capital murder was the actual perpetrator of the crime. Suspicion of guilt, though strong, or even a probability of guilt, is insufficient to support a conviction. When, as here, the evidence is wholly circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence. Rogers v. Commonwealth, 242 Va. 307, 317, 410 S.E.2d 621, 627 (1991); Cheng v. Commonwealth, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990).

But when conducting appellate review on this question of fact, considering the evidence in the light most favorable to the Commonwealth, we must grant the Commonwealth all reasonable inferences from the facts proven, and the trial court's judgment must be affirmed unless it is plainly wrong or without evidence to support it. Beavers v. Commonwealth, 245 Va. 268, 281-82, 427

S.E.2d 411, 421, cert. denied, ___ U.S. ___, 114 S.Ct. 171 (1993). And when, as here, the defendant has presented evidence in his own behalf, after the trial court has denied his motion to strike the evidence made at the conclusion of the prosecution's case-in-chief, we consider the entire record to determine whether the evidence was sufficient. Bunch v. Commonwealth, 225 Va. 423, 439, 304 S.E.2d 271, 280, cert. denied, 464 U.S. 977 (1983).

On November 22, six days before the murders, Benji Vaughan and defendant were "playing around" at a local motel. Defendant "had a pistol," accidently shot Vaughan once in the foot, and transported him to a hospital where the wound was treated and the bullet recovered. Expert testimony showed that the ".38 class" bullet was fired from the same handgun later used to shoot the Rosenbluths.

Three weeks earlier, on November 4, the general manager of a local motel, who was also "a federally licensed gun dealer," accompanied police officers to a room occupied by defendant and Graham following a report that "two individuals in the room were armed." Defendant claimed ownership of a "chrome or nickel-plated revolver, . . . a .38 or a .357 magnum."

On a day "before Thanksgiving" in the bedroom occupied by defendant, his father observed "a silver shiny looking gun, maybe about 8 inches long." The father ordered defendant to remove the weapon from the home.

The defendant "concedes" that the evidence is sufficient to

prove that the "lost weapon was the same weapon which wounded Benji Vaughan."  Nevertheless, he contends that "the evidence does not put the gun in his hands on the date of the Rosenbluths' murders."  As the Attorney General argues, this contention ignores the state of the evidence touching this issue.

The defendant elected to testify, admitting that he was present in the victims' home when they were shot but denying that he shot either victim.  He suggested in his testimony that Vaughan was Graham's accomplice in the murders.  Defendant testified that the revolver used to shoot Vaughan actually belonged to Vaughan and that Vaughan retained possession of the handgun after the accidental shooting.  Defendant admitted he was armed when he went to the victims' home on the day in question, but claimed he was carrying a .380 caliber automatic.  When asked on cross-examination the whereabouts of that weapon, defendant said his brother "has it" and that he had not asked the brother to produce the weapon at the trial.  Defendant also admitted participating in the theft of the victims' property, as well as in the attempts to dispose of or destroy their motor vehicles.

But Vaughan also testified at trial, subpoenaed as a witness by the prosecution.  He denied any involvement in the murders, stating he did not know the location of the victims' home. Additionally, Vaughan denied that he owned or possessed, either before or after the accident, the revolver with which defendant shot him.

Therefore, the conflicting testimony on whether defendant was the actual perpetrator of the murders presented a credibility question for the jury to resolve. Obviously, the jury in weighing the evidence refused to accept defendant's denial of guilt.

"Discarding the evidence of the accused in conflict with that of the Commonwealth, we must regard as true the Commonwealth's evidence and all fair inferences to be drawn therefrom." Toler v. Commonwealth, 188 Va. 774, 782, 51 S.E.2d 210, 214 (1949). The defendant's contradictory statements "furnish bases for reasonable inferences that his explanations were made falsely in an effort to conceal his guilt." Id. Indeed, on cross-examination defendant stated he was fully aware that to be convicted of capital murder, the Commonwealth was required to prove "without a reasonable doubt that I was the triggerman."

Thus, the facts established by the evidence that the jury was entitled to accept on this issue are as follows. Six days prior to the homicides, the defendant owned and had in his possession the very weapon used to kill the victims. He was physically present in the victims' home and armed at the time of the shootings. By his own admission, he was armed with a handgun similar to the one used to shoot the victims. Yet, he failed to produce that weapon, even though it was in possession, he claimed, of a near relative. On the day of the crimes, neither

Vaughan, nor any other person, had possession of the .38 caliber revolver owned by defendant. The logical and legitimate inference from these facts and the other evidence is that defendant used his .38 caliber revolver to shoot both victims.

"The facts, accepted by the jury, admitted of inferences of guilt more probable and natural than of any reasonable hypothesis of innocence, and warranted the jury in rejecting [defendant's] explanations as untrue. In other words, the facts established are consistent with his guilt and inconsistent with his innocence." Id. Accordingly, we cannot say the finding that defendant was the perpetrator of the murders is plainly wrong or without evidence to support it. Parenthetically, there is no merit to defendant's contention that the evidence is insufficient to prove the murders were committed in the course of a robbery.

This case is unlike Rogers and Cheng, in which we reversed capital murder convictions because the Commonwealth failed to establish the respective defendants were the perpetrators of the crimes. Importantly, the defendant in neither case testified in an attempt to conceal his guilt.

Also, in Rogers, we said that the "significant weakness in the Commonwealth's case is the lack of any evidence, direct or circumstantial, which places the murder weapon in defendant's hands." 242 Va. at 319, 410 S.E.2d at 628. We pointed out that the defendant's fingerprints were not on the murder weapon, a knife, and said "there is no evidence which, by legitimate

inference or otherwise, places the knife in his possession at any time." Id. Here, in contrast, the firearm used to shoot these victims was in defendant's exclusive possession at material times prior to the killings.

Also, in Cheng, unlike the present case, the evidence was inconclusive on the question whether the defendant was directly involved with the crimes. 240 Va. at 43, 393 S.E.2d at 608. We held the jury was not justified in inferring that defendant fired the fatal shots, "especially when there were three known participants in the crimes." Id. In the present case, however, the evidence is clear that defendant directly participated in the crimes by virtue of his admitted presence at the crime scene armed with a deadly weapon. Even though there was another known participant in these crimes, the ballistics evidence establishes the precise participation of defendant, who shot both victims with his own handgun while Graham shot only one.

Next, defendant contends that the fact of Graham's life sentence imposed for his participation in the instant crimes is relevant to the jury's consideration of defendant's punishment, and that the court below erred in denying his several motions to present this evidence to the jury. In May 1994, Graham was convicted of two charges of capital murder for the premeditated killing of Mrs. Rosenbluth, two charges of robbery, and three charges of using a firearm in the commission of a felony. He had been indicted for the first-degree murder of Mr. Rosenbluth and

using a firearm in the commission of that offense, but was acquitted of those charges.

Graham was sentenced for the capital murder of Mrs. Rosenbluth to life imprisonment and a fine of $100,000. Graham v. Commonwealth, 250 Va. at ___, ___ S.E.2d at ___. Defendant argues (inconsistently with his contention on the preceding issue) that he and Graham "are equally culpable in the Rosenbluths' murders." Therefore, he says, Graham's life sentence for almost identical involvement in the same crimes is relevant to defendant's punishment because it bears on the issue of mitigation. We disagree.

In Coppola v. Commonwealth, 220 Va. 243, 257 S.E.2d 797 (1979), cert. denied, 444 U.S. 1103 (1980), we said, "Evidence as to the result of another defendant's trial for the same crime is irrelevant to the determination by the jury of the appropriate punishment for the defendant whose sentence is being weighed." Id. at 254, 257 S.E.2d at 805. We reasoned that, under the applicable statute, this Court "is required to consider and determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, but no such responsibility is imposed upon the jury in the trial court." Id. We said that the jury, during the sentencing phase of the capital murder trial, "is required to consider evidence in mitigation of the offense relevant to the defendant's past record and the nature of his conduct in committing the crime," not the

details of another defendant's sentence for the same crime.  <u>Id</u>.

Next, defendant contends the trial court erred in allowing the Commonwealth to present, during the penalty phase of the trial, evidence of unadjudicated crimes involving the defendant.  The prosecution presented evidence tending to prove that defendant participated during October 1993 in a robbery and shooting at a local motel, and in another robbery in which there was a murder and a maiming.  The latter incident was the subject of Graham's convictions reviewed in <u>Graham</u> v. <u>Commonwealth</u>, <u>supra</u>, 250 Va. 79, 459 S.E.2d 97 (1995).  Of course, evidence of unadjudicated crimes is relevant to the future dangerousness predicate of the capital sentencing statute, and not to the vileness predicate.  <u>Spencer</u> v. <u>Commonwealth</u>, 238 Va. 295, 317, 384 S.E.2d 785, 799 (1989), <u>cert</u>. <u>denied</u>, 493 U.S. 1093 (1990).

We do not reach this question for decision.  The defendant has failed to assign error to the jury's finding of future dangerousness.  <u>See</u> Rules 5:22(b); 5:17(c).  Therefore, the defendant will not be allowed to challenge the admission of any evidence relevant to that predicate about which there is no claim of invalidity.

Next, the defendant argues that the evidence was insufficient to sustain the jury's finding of vileness.  He says "the record is absolutely silent as [to] the existence of any physical or psychological torture.  Aside from the shots that killed them, the Rosenbluths suffered no wounds or mutilation.

There were no other signs of physical or mental abuse.  The record supports only the finding that they were killed almost instantly and within seconds of each other."  We conclude that the finding was amply supported by the evidence.

Code § 19.2-264.2 provides that the death penalty shall not be imposed unless the fact finder determines either that the defendant, based on his criminal record, would be "a continuing serious threat to society," the future dangerousness predicate, or that the defendant's "conduct in committing the offense . . . was outrageously or wantonly vile, horrible or inhuman in that it involved . . . depravity of mind or an aggravated battery to the victim," the vileness predicate.  Executing two persons in their home and then stripping their bodies of jewelry and stealing their personal property manifestly demonstrates a depravity of mind.

Within the context of the statute, the term "aggravated battery" means "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder."  Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979).  A killing inflicted by multiple gunshot wounds may constitute an aggravated battery when there is an appreciable lapse of time between the first shot and the last, and when death does not result instantaneously from the first.  Barnes v. Commonwealth, 234 Va. 130, 139-40, 360 S.E.2d 196, 203 (1987),

<u>cert</u>. <u>denied</u>, 484 U.S. 1036 (1988).

In the present case, the jury reasonably could have found that each victim died from an aggravated battery. The evidence supports the finding that defendant shot the husband in the face while he was sitting or standing, walked to where the victim had fallen on his back and shot him again in the face. The defendant then walked over to the wife, who already had been shot by Graham, and fired two more bullets into her head. Therefore, there was an appreciable lapse of time between the two shots fired by defendant at the husband, as well as between the shots fired at the wife by Graham and the defendant. The evidence showed that seconds elapsed between the first shots to each victim and the last. Thus, neither died "instantaneously." And, the evidence also showed that neither victim died "instantaneously" from the first gunshot wounds.

The remaining assignments of error do not merit extended discussion. In assignment of error No. 2, the defendant argues the trial court improperly refused to allow three questions on voir dire regarding the nature and definition of "mitigation" as the term relates to punishment in a capital murder proceeding. He says the trial court's action "rendered his trial fundamentally unfair and deprived him of due process required by the 14th Amendment." No constitutional objection was made in the trial court, and we shall not permit it to be raised for the first time on appeal. Rule 5:25. Additionally, we hold that the

trial court did not abuse its discretion in refusing the proffered questions on "mitigation."

In assignment of error No. 7, defendant asserts the trial court improperly denied his motion to suppress evidence found in "defendant's home."  It will be recalled that defendant occupied a room in his father's residence.  The evidence showed that the father consented to the search of the room and that, at the very least, the father, the owner of the premises, had a joint right of possession in the premises.  Thus, the police properly relied on the owner's consent to search.  O'Dell v. Commonwealth, 234 Va. 672, 682, 364 S.E.2d 491, 496, cert. denied, 488 U.S. 871 (1988).

In assignment of error No. 28, the defendant contends the trial court improperly failed to grant his tendered instruction that would have allowed the jury to find defendant guilty as an accessory after the fact.  Defendant argues the jury could have determined from the evidence that he was not involved in the actual homicides but aided and abetted Graham and Vaughan "in their get away from the scene and assisted them in concealing their crime."  The trial court properly refused the instruction. Even if we assume such a theory was supported by the evidence, the form of the instruction was flawed.  It failed to set forth an essential element of the law with respect to accessories after the fact, that is, the felony must be completed for the principle to apply.  See Manley v. Commonwealth, 222 Va. 642, 645, 283

S.E.2d 207, 208 (1981).

In assignment of error No. 12, defendant contends the trial court incorrectly allowed the jury to view the victim of the maiming that occurred in one of the prior crimes in which defendant allegedly participated. The victim, suffering from permanent brain damage, was permitted to walk into the courtroom and leave. This demonstration, connected with an unadjudicated crime, was relevant to the future dangerousness predicate. As we already have said, the defendant failed to assign error attacking that finding, and he will not be permitted to challenge demonstrative evidence relevant to that predicate.

In assignment of error No. 13, defendant contends the trial court incorrectly permitted one Maurice Turner, a penitentiary inmate who met defendant in jail, to testify during the penalty phase of the trial. Turner's testimony concerned defendant's violent conduct in jail and certain admissions defendant made about his participation in crimes in the Richmond area. This action by the trial court, according to the defendant, violated "the 8th and 14th Amendments of the United States Constitution." These constitutional claims were not raised at trial, and we will not entertain them for the first time on appeal. Rule 5:25. Additionally, this contention also deals with evidence relevant to the future dangerousness finding, which may not be attacked because of the procedural default previously discussed.

Likewise, defendant's claim in assignment of error No. 16

that the trial court incorrectly denied his "motion for a new sentencing hearing for deprivation of individualized consideration," is procedurally barred because it relates to the evidence of unadjudicated crimes, which is barred from attack due to failure to assign error to the future dangerousness finding. The defendant, in an obscure argument, says he was not afforded "individualized consideration" because the "jury received no guidance as [to] the manner in which the evidence of unadjudicated crimes should be considered."

We repeatedly have rejected the challenge that defendant makes in assignment of error No. 17 that the terms "vileness" and "depravity of mind," used in the capital sentencing scheme, are unconstitutionally vague. See, e.g., Stockton v. Commonwealth, 227 Va. 124, 134-35, 314 S.E.2d 371, 378, cert. denied, 469 U.S. 873 (1984). Thus, we reject it here.

In assignment of error No. 19, the defendant contends that the trial court improperly denied his request for a new sentencing proceeding based upon the prosecutor's alleged failure to inform defendant of exculpatory evidence. The defendant complains that the Commonwealth failed to disclose that the maiming victim had been unable to identify defendant as a participant in that prior crime. Again, this relates to the future dangerousness predicate, and the validity of that finding is immune from attack.

In assignments of error Nos. 22 and 23, defendant contends

the prosecutor engaged in prejudicial argument during both the guilt and penalty phases of the bifurcated proceeding. Defendant asserts the prosecutor sought to shift the burden of proof during the guilt phase and sought to inflame the jury during the penalty phase. None of these claims was preserved for appellate review. Errors assigned because of improper comments of the prosecutor during argument "will not be considered on appeal unless an accused timely moves for a cautionary instruction or for a mistrial." Cheng, 240 Va. at 38, 393 S.E.2d at 606. In the present case, these alleged errors were not preserved because the defendant either did not object or move in a timely fashion for a cautionary instruction or a mistrial.

Finally, in assignments of error Nos. 26 and 27, defendant argues the trial court incorrectly allowed during the penalty phase certain testimony of a criminologist, who testified that defendant is "a dangerous, violent criminal." This issue is barred from appellate review because the testimony relates to the future dangerousness predicate, as we already have explained.

When death sentences are before us for automatic review, our statute requires us to consider, not only the trial errors enumerated by the defendant, but also whether the sentences to death were imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentences are excessive or disproportionate to the penalty imposed in similar cases. Code § 17-110.1(C). "On the question of excessiveness

and disproportionality, we determine whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant."  Weeks, 248 Va. at 478, 450 S.E.2d at 391.  In making this determination, we consider records of all capital murder cases reviewed by this Court, including cases where life imprisonment has been imposed.  Code § 17-110.1(E).

Previous cases in which the death sentence was imposed based upon the vileness and future dangerousness predicates are documented in Breard v. Commonwealth, 248 Va. 68, 89, 445 S.E.2d 670, 682, cert. denied, ___ U.S. ___, 115 S.Ct. 442 (1994).  Based upon a review of these cases, we conclude that the death sentences in this case are not excessive or disproportionate to the punishment generally imposed by juries in the Commonwealth for similar conduct.  And, we reject defendant's argument that his punishment is excessive or disproportionate because Graham received a life sentence arising from the same incident.  We consistently have rejected efforts by defendants to compare their sentences with those received by confederates.  Murphy v. Commonwealth, 246 Va. 136, 145, 431 S.E.2d 48, 53, cert. denied, ___ U.S. ___, 114 S.Ct. 336 (1993).

Consequently, we hold that the trial court committed no error, and we have independently determined from a review of the entire record that the sentences of death were properly assessed. Thus, the judgment of the trial court will be affirmed.

Record No. 950760 - Affirmed.

- 23 -

Record No. 950761 – <u>Affirmed</u>.