PRESENT:  All the Justices

DARYL RENARD ATKINS

                                    OPINION BY
v.  Record Nos. 981477 & 981478  JUSTICE LAWRENCE L. KOONTZ, JR.
                                    February 26, 1999[*]
COMMONWEALTH OF VIRGINIA

             FROM THE CIRCUIT COURT OF YORK COUNTY
                  N. Prentis Smiley, Jr., Judge

     In this appeal, we review the capital murder conviction and

death sentence imposed by a jury on Daryl Renard Atkins.

                             I.
                         PROCEEDINGS

     On November 19, 1996, indictments were returned against

Atkins charging that on August 17, 1996, Atkins abducted,

robbed, and murdered Eric Michael Nesbitt in the commission of

the robbery.  Code §§ 18.2-48, -58, and -31(4).  Atkins was also

charged with use of a firearm while committing each of these

offenses.  Code § 18.2-53.1.[1]

     Atkins filed a pre-trial motion to have the Virginia

capital murder and death penalty statutes declared

unconstitutional.  Along with this motion, Atkins filed an

extensive brief containing multiple theories for his assertion

that the substantive criminal law and procedural statutes

     _____

     [*]The January 8, 1999 opinion was withdrawn when a petition
for rehearing was granted February 23, 1999.

     [1]Prior to trial, Atkins pled guilty to the abduction and
robbery charges and their associated firearm crimes.  He does

governing capital crimes in Virginia are constitutionally deficient. The trial court, relying on conclusive statements of this Court supporting the constitutionality of these statutes, overruled this motion. The trial court also denied Atkins' motion for additional peremptory juror challenges.

In a motion in limine, Atkins sought to limit the introduction by the Commonwealth of DNA evidence related to blood samples found in Nesbitt's truck which indicated that Atkins and Nesbitt were the sources of that blood. Atkins asserted that this evidence was not sufficiently credible because William A. Jones was also an occupant of the truck and his blood had not been subjected to the DNA testing. In the alternative, Atkins sought to have a blood sample obtained from Jones and DNA tests performed thereon to establish whether Jones was a potential source for the blood found in the truck. The trial court received a proffer from the Commonwealth that there was no evidence that Jones had been wounded and, thus, that Jones was excluded as a possible source of the blood. On this ground, the trial court denied the motion.

Jury selection began on February 9, 1998 and continued the next day. Starr D. Christian, a 19-year-old black female, was called from the venire and questioned by the trial court and

---

not challenge his convictions or sentences for these crimes in this appeal.

counsel for the Commonwealth and Atkins.  The trial court asked Christian if she or any member of her immediate family had "ever been the victim of a violent crime."  Christian responded in the negative.  Atkins' counsel subsequently asked Christian if she or any member of her immediate family had "ever been the victim of a crime, not just a violent crime, but a crime."  Christian responded that her brother's car had been broken into on one occasion.  Neither party challenged Christian for cause, and the trial court retained her in the venire for final jury selection.  Thereafter, the Commonwealth used one of its four peremptory strikes to remove Christian from the jury.  Code §19.2-262.  Atkins asserted that Christian had been struck based upon her race in violation of the ruling in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

Responding to Atkins' challenge, the Commonwealth initially asserted that it struck Christian because she was young and unmarried and, thus, would be less likely, in its view, to have empathy for the victim.[2]  The Commonwealth further noted that it had acquired information that, contrary to her testimony,

---

[2]The Commonwealth also contended that Christian might lack empathy for the victim because she was not a parent, but subsequently conceded that Christian had not been questioned as to whether she had children or not.  In addition, the Commonwealth conceded that it had discovered an offense report concerning an altercation between Christian and a relative that indicated that Christian possibly was a parent.

Christian had been the victim of a grand larceny within the past year. The Commonwealth provided defense counsel with a copy of an offense report that listed Christian as the victim and complainant in the theft of a ring. Based upon this incident, the Commonwealth ultimately asserted Christian's lack of truthfulness as its race-neutral reason for removing her from the jury.

Atkins contended that a peremptory strike premised on the age of the prospective juror might also "run[] afoul of the Batson ruling." Atkins further contended that the Commonwealth gave "no indication nor were we told that there was a concern about [Christian's] truthfulness" at the time she was examined.

Noting its express concern over "the apparent oversight or flagrant incorrect answer to the Court's question and to counsel's question relative to victims of a crime," the trial court found that the Commonwealth had stated an adequate race-neutral reason for striking Christian from the jury. Accordingly, the trial court overruled Atkins' Batson challenge.

## II.
## EVIDENCE

### A. Guilt Phase

We will review the evidence in the light most favorable to the Commonwealth. Clagett v. Commonwealth, 252 Va. 79, 84, 472 S.E.2d 263, 265 (1996), cert. denied, 519 U.S. 1122 (1997). On

4

the afternoon of August 16, 1996, William A. Jones[3] and Atkins were "drinking and smoking weed" at the home Atkins shared with his father. During the course of that afternoon, "[a] couple of [Atkins'] friends came by, in and out." On several occasions during the afternoon and later that evening, those present pooled their money, and Atkins and Jones walked to a nearby convenience store to buy beer or were driven by one of Atkins' friends to an ABC store to buy liquor.

That evening between 10:30 and 11:00 p.m., a friend of Atkins, known to Jones only as "Mark," arrived at the home. Mark had brought a handgun with him and gave it to Atkins after Atkins said "that he wanted to use it, he would bring it back in the morning." A short time later, Atkins and Jones again walked to the convenience store to buy beer. Atkins told Jones that he did not have enough money and was going to "panhandle and get some change up." Atkins had the handgun he had borrowed from Mark tucked behind the waistband of his pants, partially concealed by his belt buckle.

While Jones waited, Atkins approached several people to ask for money and collected some from one or two. Nesbitt, who was a stranger to Atkins, arrived at the store in his truck at

---

[3]Prior to Atkins' trial, Jones entered into a plea agreement with the Commonwealth dated September 5, 1997, in which Jones agreed to testify against Atkins in exchange for a reduction in the charges against him arising out of the murder of Nesbitt.

approximately 11:30 p.m.  After a brief conversation with Atkins, Nesbitt went into the store.  When Nesbitt returned to his truck and was preparing to leave the parking lot, Atkins "whistled" at him and Nesbitt stopped his truck.

Atkins went to the passenger's side of the truck and Jones went to the driver's side.  Atkins then pointed the handgun at Nesbitt and ordered Nesbitt to "[m]ove over, let my friend drive."  Jones entered the truck from the driver's side and Atkins entered from the passenger's side.

As Jones drove the truck away from the convenience store, Atkins demanded that Nesbitt surrender his wallet.  Atkins removed $60 from the wallet and was returning it to Nesbitt when he noticed a bankcard inside the wallet.  On Atkins' instruction, Jones drove to a branch of Crestar Bank where Atkins forced Nesbitt to withdraw $200 using the bankcard from the bank's drive-through automatic teller machine.  The security camera in this automatic teller machine recorded the truck arriving at the bank shortly after midnight on August 17, 1996.  The videotape produced by the camera showed that Jones was driving, Atkins was in the passenger seat, and Nesbitt was between them.  Nesbitt had to lean across Jones in order to operate the machine.  During this entire time, Atkins kept the handgun pointed at Nesbitt.

6

Jones then drove to the parking lot of a nearby school where he and Atkins discussed what they should do with Nesbitt. Jones urged Atkins to "just tie him up so we can get away." Atkins told Jones he knew of a place near his grandfather's house in Yorktown where they could leave Nesbitt and directed Jones to drive toward Yorktown on Interstate 64. Nesbitt asked them "just don't hurt me" and made no attempt to escape.

Upon arriving in a secluded area of York County off the Lee Hall exit of Interstate 64, Atkins exited the truck and ordered Nesbitt to do the same. "Nesbitt stepped out of the vehicle and probably took two steps" when Atkins began shooting him. Jones attempted to exit the truck because he feared that some of the shots were "coming in the truck." Unable to open the driver's side door, Jones rolled down the driver's side window and "jumped" out of the truck.

Jones began to struggle with Atkins for the handgun and Atkins was shot in the leg during that struggle. After Jones obtained the handgun, he drove Atkins to the emergency room of a local hospital, leaving Nesbitt's dead body at the scene of the shooting. Outside the emergency room, Jones asked Atkins for some of the money that had been taken from Nesbitt and then drove away alone in Nesbitt's truck.

After leaving Atkins at the emergency room, Jones drove to a motel in Newport News where he abandoned Nesbitt's truck.

7

Jones spent the next several days moving from motel to motel. He cut his hair in an attempt to disguise his appearance. Jones subsequently returned to the first motel, where police, who previously had discovered the abandoned truck at the motel and were maintaining a surveillance of the area, arrested him. The handgun was not found in the truck and was never recovered.

Garland S. Clay discovered Nesbitt's body at the crime scene sometime after 3:45 a.m. on August 17, 1996 and contacted police. Investigator Frederick T. Lyons, a member of the major crimes section of the York County Sheriff's Office, arrived at the crime scene at 5:15 a.m.

Lyons discovered six shell casings near Nesbitt's body. After determining that Nesbitt had an account at Crestar Bank, Lyons learned that two withdrawals from the account had been made at Crestar automatic teller machines the previous night, one for $60 and one for $200. Lyons obtained still photographs and the videotapes from the automatic teller machines' security cameras and distributed copies to local police and media.

After the media broadcast the photographs, several callers to a "crime line phone number" identified Jones as the driver of Nesbitt's truck. One caller told police that "a person that Mr. Jones runs with was a Daryl Atkins." Based upon these identifications, Lyons obtained an arrest warrant for Jones. After interviewing Jones' father and the father's girlfriend,

Lyons "learned that Mr. Atkins was with William Jones," and obtained Atkins' address.  Finding Atkins at home, Lyons was able to identify Atkins from the security camera photographs and placed him under arrest.

Dr. Leah L. E. Bush, an Assistant Chief Medical Examiner for the Commonwealth, performed an autopsy on Nesbitt's body.  This autopsy revealed that Nesbitt had sustained eight separate gunshot wounds to the thorax, chest, abdomen, arms and legs.  Several of the bullets exited and reentered the body.  Three of the gunshot wounds were lethal.  However, Nesbitt could have lived for several minutes before "the bleeding was to the point where his blood pressure would not support consciousness and life."  Three bullets were recovered during the autopsy.

Additional forensic evidence showed that the six shell casings recovered from the crime scene had all been fired from the same weapon, as were the three bullets recovered from Nesbitt's body, a bullet recovered from Nesbitt's truck, and a bullet recovered from Atkins' leg.  Bloodstains found on the passenger seat and interior passenger side door of Nesbitt's truck were identified as consistent with either Nesbitt's or Atkins' blood types.  None of the tested samples was identified as likely to have come from another source.

Subsequent to his arrest and prior to his trial, while an inmate in the York County jail, Atkins shared a cell with

Stephen R. Burton.  According to Burton, Atkins told him "[t]hat he had put a boy out of a truck in York County, that he had shot at a boy to scare him."  Atkins told Burton that he was not worried about being convicted because the police "wouldn't find the weapon . . . they didn't have the weapon, the only thing they had on him was a picture holding a gun to a boy" at the automatic teller machine.  Atkins also told Burton that he had shot himself in the leg, but that he could not remember it because he was "too messed up" on drugs and alcohol to realize it.

Atkins testified on his own behalf and was the only defense witness on the issue of guilt.  Atkins' account of the robbery and murder was in direct conflict with that of Jones.  According to Atkins, he and Jones had gone to the convenience store with the intent to rob someone, and it was Jones who was armed and who initiated the contact with Nesbitt.  Atkins maintained that Jones forced his way into Nesbitt's truck, and then gave the handgun to Atkins so that Jones could drive.  Atkins admitted taking money from Nesbitt's wallet and forcing Nesbitt to withdraw money from the automatic teller machine.

Atkins further maintained that Jones said "he know [(sic)] a place and he never told me" where they could take Nesbitt and "tie him up."  After leaving the interstate, according to Atkins, Jones stopped the truck, took the handgun back from

10

Atkins, placed it in a holster on his belt, and directed Atkins and Nesbitt to change places so that Nesbitt was sitting by the passenger door.  Jones then drove "a little more" and then exited the truck and ordered Nesbitt to get out of the truck as well.  With regard to the critical issue of who was the "triggerman" in the murder of Nesbitt, Atkins maintained that Jones shot Nesbitt several times and that one of the shots struck Atkins in the leg.

The jury was instructed and heard closing arguments from counsel.  After its deliberations, the jury returned verdicts convicting Atkins of capital murder and the associated firearm crime.

B. Penalty Phase

The Commonwealth sought the imposition of the death penalty based on the aggravating factors of future dangerousness and vileness.  Code § 19.2-264.2.  During the penalty phase, to prove future dangerousness, the Commonwealth presented evidence of Atkins' prior felony convictions, which included robbing and maiming, the testimony of several victims of prior robberies and assaults committed by Atkins, and victim impact testimony from Nesbitt's mother.  After concluding the presentation of this evidence, the Commonwealth rested, and Atkins made a motion to strike the Commonwealth's evidence as to the aggravating factor of vileness on the ground that no evidence presented in the

penalty phase would support such a finding.  Code § 19.2-264.4(C).  Over Atkins' objection, the trial court permitted the Commonwealth to reopen its case in order to have the exhibits introduced during the guilt phase included in the evidence to be considered in the penalty phase.  Those exhibits included pictures of Nesbitt's body, the autopsy report, and other items.

Atkins presented the testimony of Dr. Evan Stuart Nelson, a forensic psychologist.  Dr. Nelson testified that Atkins' full scale IQ is 59 with a verbal IQ of 64 and a performance IQ of 60.[4]  Based on these scores, Dr. Nelson stated that Atkins "falls in the range of being mildly mentally retarded."  Dr. Nelson concluded that, based on Atkins' prior behavior while incarcerated, there was a "very high likelihood" that Atkins would not be "violent within the prison" if given a life sentence.

On cross-examination, Dr. Nelson conceded that he "did not find a reason to raise a concern to the Court or counsel about [Atkins'] competency" to stand trial.  In addition, Dr. Nelson concluded from the data available to him that "there were no indications that [Atkins] could not appreciate the nature of his behaviors and control himself."

_____

[4]Dr. Nelson explained that "the full scale IQ score is not a simple mathematical average between 64 and 60.  It's actually putting all of the items back together, charting out a graph of the scores and then figuring out where people stand."

12

After all the evidence relating to the penalty phase had been received, the trial court and counsel considered jury instructions and the verdict form.  The trial court granted the Commonwealth's first instruction which properly detailed the necessity of the jury finding that either one or both of the statutory aggravating factors of future dangerousness and vileness were proven beyond a reasonable doubt before it could impose the death penalty.  It further provided that the jury could nonetheless impose a sentence of imprisonment for life or a sentence of imprisonment for life and a fine if "the death penalty is not justified."  Finally, this instruction properly directed the jury that if the Commonwealth failed to prove beyond a reasonable doubt at least one of the aggravating factors of future dangerousness or vileness, then it was required to impose a sentence of imprisonment for life or a sentence of imprisonment for life and a fine.

The Commonwealth's second instruction defined "imprisonment for life" to mean "life without possibility of parole."  The Commonwealth's third instruction detailed the possible sentences for the firearm crime.  The trial court granted both of these instructions.

The Commonwealth proffered an instruction on mitigating circumstances.  Atkins' counsel expressly stated that he did not want the trial court to give this instruction, and the

Commonwealth withdrew it.  Atkins did not proffer an alternative instruction on mitigating circumstances and raised no objection to the absence of an express instruction on mitigation.

During the discussion of the instructions, several references were made to the proposed jury verdict forms.  At that time, the Commonwealth advised the trial court that it was in the process of redrafting its proposed verdict form because "there was a revision that [Atkins' counsel] wanted [the Commonwealth] to make" in that verdict form.  Atkins' counsel responded, "[U]nless [the Commonwealth has] done a major redraft, I prefer mine which gives the jury every option.  [The Commonwealth's], from what I saw, was . . . limited to death."  The trial court then stated, "Well, they obviously have the option of life."

A short time later, the Commonwealth's redrafted verdict form was given to the trial court and Atkins' counsel.  Referring to this form, the Commonwealth stated, "Ours are the same as the Defense's, Judge.  They are both Model Instructions."

Atkins' proposed verdict form contained seven alternative findings.  The first six of these, in order, permitted the jury to impose either a sentence of death or one of imprisonment for life and a fine if it found that both aggravating factors were proven, if it found future dangerousness alone was proven, or if

14

it found vileness alone was proven. The seventh finding on Atkins' form permitted the jury to impose only a sentence of life imprisonment and a fine if neither aggravating factor was found to have been proven beyond a reasonable doubt.

The Commonwealth's proposed verdict form contained six alternative findings corresponding, although in a different order, with the first six alternative findings on Atkins' proposed form. It did not provide a finding permitting the jury to impose only a life sentence and fine if neither aggravating factor was found to have been proven beyond a reasonable doubt.

After the instructions were agreed upon, the trial court reviewed the two sets of proposed verdict forms and stated, "Either is okay with the Court. I think they both say the same thing, identically the same thing." Atkins' counsel responded, "Pretty close the same thing." The Commonwealth then stated that the findings in its form were merely listed in a different order from that of the defense's form. The Commonwealth asserted that the order of its form, giving options for death and life imprisonment verdicts based on the individual aggravating factors and then the option for a verdict premised on both factors being present was more appropriate. The trial court accepted the Commonwealth's proposed verdict form. Atkins did not object to the content of the Commonwealth's verdict form

15

at the time it was adopted by the trial court or when it was subsequently read to the jury.

In closing argument, Atkins' counsel made brief references to Atkins' low intelligence, and urged the jury to impose a sentence of life without possibility of parole rather than a death sentence. Counsel argued that a life sentence would be appropriate, based on Dr. Nelson's opinion that Atkins would be able to exercise some level of self-control within the structured environment of prison.

The jury found that Atkins both represented a future danger to society and that the murder of Nesbitt had been outrageously or wantonly vile. Based upon its finding of these aggravating factors, the jury returned a verdict imposing a sentence of death on Atkins for the murder of Nesbitt.

## C. Sentencing Hearing

At sentencing, Atkins' counsel objected for the first time to the failure of the verdict form to include a finding permitting the jury to impose only a life sentence and fine if it found that neither aggravating factor was proven beyond a reasonable doubt. Counsel made a motion to set aside the jury's verdict imposing the death penalty. The trial court ruled that the objection was not timely, and further noted that the evidence was adequate to support the jury's findings of future dangerousness and vileness, precluding the possibility of it

16

imposing the mandatory sentence of life imprisonment in the absence of such factors.  The trial court then confirmed the jury's verdict and sentenced Atkins to death.  This appeal followed.

### III.
### DISCUSSION

We begin by noting that Atkins has modified the order and phrasing of his assignments of error in his opening brief from those originally designated by him under Rule 5:22(b).  In our discussion, we shall refer only to the 19 original assignments of error as listed by Atkins in the Rule 5:22(b) designation.[5] Sheppard v. Commonwealth, 250 Va. 379, 385-86, 464 S.E.2d 131, 135 (1995), cert. denied, 517 U.S. 1110 (1996).  Atkins has not briefed or argued assignments of error 9, 13, and 20 and, thus, we will not consider them.  Id. at 386, 464 S.E.2d at 135.

A. Issues Previously Decided

In assignments of error 3, 4, 5, 6, 7, and 8, Atkins raises various challenges to the constitutionality of the Virginia capital murder statute and the statutory scheme under which capital murder trials are conducted and death sentences are reviewed on appeal.  In addition, in assignment of error 12, Atkins asserts the general proposition that "the Virginia Death

---

[5]In the Rule 5:22(b) designation, the assignments of error are numbered from 1 to 20, but there is no assignment of error numbered 18.

Penalty Statutes Violate the Virginia and United States Constitutions." On brief, Atkins does not make a particularized argument relevant to assignment of error 12, but simply identifies it as being subsumed within the argument of his other constitutional challenges. The arguments raised in these assignments of error, which in several instances are overlapping, have been thoroughly addressed and rejected in numerous prior capital murder cases.[6] We find no reason to modify our previously expressed views on these issues.

Atkins further assigns error to the trial court's failure to grant him additional peremptory strikes during jury selection. See Code § 19.2-262. We have repeatedly held that there is no right to additional peremptory challenges in a

---

[6]See, e.g., Barnabei v. Commonwealth, 252 Va. 161, 178-79, 477 S.E.2d 270, 280 (1996), cert. denied, 520 U.S. 1224 (1997) (aggravating factors of future dangerousness and vileness are not unconstitutionally vague); Joseph v. Commonwealth, 249 Va. 78, 82, 452 S.E.2d 862, 865, cert. denied, 516 U.S. 997 (1995)(death penalty does not constitute cruel and unusual punishment; appellate review process does not deprive defendant of statutory rights and due process of law); Breard v. Commonwealth, 248 Va. 68, 74, 445 S.E.2d 670, 675, cert. denied, 513 U.S. 971 (1994)(method of instructing jury on mitigation does not impermissibly interfere with jury's consideration of evidence offered in mitigation); Stewart v. Commonwealth, 245 Va. 222, 229, 427 S.E.2d 394, 400, cert. denied, 510 U.S. 848 (1993)(proof of future dangerousness by prior criminal convictions does not violate double jeopardy); Smith v. Commonwealth, 219 Va. 455, 476-77, 248 S.E.2d 135, 148 (1978), cert. denied, 441 U.S. 967 (1979)("vileness" and "dangerousness" predicates for imposition of the death penalty do not impermissibly fail to guide the jury's discretion).

capital murder trial.  See, e.g., Strickler v. Commonwealth, 241 Va. 482, 489, 404 S.E.2d 227, 232, cert. denied, 502 U.S. 944 (1991).

B. Request for Blood Sample

Atkins assigns error to the trial court's denial of his motion in limine to have a blood sample taken from Jones or in the alternative limiting the Commonwealth's presentation of the results of DNA testing of the blood found at the scene of the murder.  Atkins contends that in doing so, the trial court interfered with his "right to call evidence in his favor."  We disagree.

In arguing his motion, Atkins conceded that there was no evidence to suggest that Jones was a potential source of any of the blood evidence recovered from the crime scene.  The evidence at trial showed that each of the blood samples could almost certainly be linked to either Nesbitt or Atkins.  Therefore, Atkins' request that a sample of Jones' blood be taken for DNA comparison to the blood found at the crime scene was not founded on any reasonable claim that it was necessary to his defense. See O'Dell v. Commonwealth, 234 Va. 672, 686, 364 S.E.2d 491, 499, cert. denied, 488 U.S. 871 (1988).  Moreover, Atkins cannot demonstrate that the failure to make that evidence available to him was materially prejudicial to the presentation of his theory

of the case.  See Satcher v. Commonwealth, 244 Va. 220, 244-45,

421 S.E.2d 821, 836 (1992), cert. denied, 507 U.S. 933 (1993).

C. Batson Challenge

Atkins contends that the trial court erred in overruling

his Batson challenge to the Commonwealth's peremptory strike of

Christian.  While making only a cursory argument on this issue

on brief, during oral argument of this appeal Atkins' counsel

asserted that the Commonwealth's proffer of the offense report

was insufficient to establish that Christian had actually been

the victim of a crime and, thus, that it would not support the

Commonwealth's contention that Christian had failed to answer

the trial court's and counsel's questions truthfully.

In Batson, the United States Supreme Court held that

purposeful discrimination based on race in selecting jurors

violates the Equal Protection Clause.  Batson, 476 U.S. at 89.

If an accused makes a prima facie showing of the prosecution's

use of peremptory strikes on the basis of race, the burden

shifts to the prosecution to articulate race-neutral reasons for

such strikes.  Chichester v. Commonwealth, 248 Va. 311, 323, 448

S.E.2d 638, 646 (1994), cert. denied, 513 U.S. 1166 (1995).  On

appeal, we will assume, without deciding, that Atkins made a

prima facie showing of a discriminatory strike.  Thus, we

consider whether the trial court abused its discretion in

accepting the Commonwealth's articulated race-neutral reason for

striking the prospective juror.  A trial court's determination whether the reason given is race-neutral is entitled to great deference, Spencer v. Commonwealth, 238 Va. 295, 310, 384 S.E.2d 785, 795 (1989), cert. denied, 493 U.S. 1093 (1990), and will not be reversed on appeal unless it is "clearly erroneous." Hernandez v. New York, 500 U.S. 352, 369 (1991).

There is no merit to Atkins' contention on this issue.  The trial court was not required to determine whether the criminal complaint filed by Christian would ultimately prove sufficient to establish that she had actually been the victim of a crime. Nor was the Commonwealth required to show that Christian could have been struck for cause.  Rather, the Commonwealth's burden was to show that it had a sufficient race-neutral reason for using one of its peremptory strikes in removing Christian from the jury.  At the time the Commonwealth exercised this peremptory strike, it had a sufficient subjective basis for questioning Christian's truthfulness.  The trial court accepted the Commonwealth's stated basis for its action, and that decision is clearly supported by the record.

D. Admission of Atkins' Statement to Police

On August 21, 1996, Atkins voluntarily gave a statement to Investigator Lyons in which Atkins admitted his participation in the abduction, robbery, and murder of Nesbitt.  In that statement, however, Atkins denied that he had been the

21

"triggerman" and asserted that Jones alone had shot Nesbitt. At trial, during cross-examination of Lyons, Atkins' counsel attempted to elicit testimony from Lyons that Atkins' statement contained this denial and assertion. The Commonwealth objected on the ground that, while the statement inculpated Atkins as a participant in these crimes, Atkins' denial that he was the "triggerman" was self-serving and inadmissible hearsay. The trial court ultimately sustained that objection and cautioned the jury to disregard any reference to this statement.

Subsequently during his testimony, Atkins was permitted to reference the content of this statement in great detail. Significantly, Atkins testified that in his prior statement he "told them that William Jones pulled the trigger." Consistent with that assertion, Atkins further testified that he did not "shoot a gun" on the night of the murder and that Jones had shot Nesbitt.

On brief, Atkins asserts only that "Mr. Atkins' statement to the [police] should have been admitted as an exception to the hearsay rule under the statement against penal interest exception." This assertion simply ignores the fact that the statement was ultimately admitted in conjunction with Atkins' testimony, and that the jury clearly had the benefit of Atkins' prior consistent assertion to bolster his trial testimony that he was not the triggerman. Thus, no prejudice resulted to

22

Atkins.  Moreover, there is no merit to Atkins' assertion that his prior statement should have been admitted during Lyons' testimony.

At the time of Lyons' testimony, Atkins had not testified and the limited circumstances in which a prior consistent statement is admissible were not applicable.  See Manetta v. Commonwealth, 231 Va. 123, 128 n.3, 340 S.E.2d 828, 831, n.3 (1986).  Atkins' prior consistent statement on the triggerman issue provided no basis to impeach the testimony of Lyons because Lyons was not the declarant or otherwise bound by the statement.  Nor could the statement have been admitted as being against penal interest, since Atkins, the declarant, was not "unavailable" to testify at trial, which is a prerequisite to invoke that exception to the hearsay rule.  Ellison v. Commonwealth, 219 Va. 404, 408, 247 S.E.2d 685, 688 (1978)

E. Sufficiency of the Evidence

Atkins contends that the trial court erred in failing to set aside the jury's verdict convicting him of capital murder because the evidence failed to establish beyond a reasonable doubt that he was the triggerman in the killing of Nesbitt.  On brief, Atkins candidly states that "[t]his case comes down to the testimony of Mr. William A. Jones and Stephen R. Burton against the testimony of Mr. Atkins."  During oral argument of this appeal, Atkins' counsel conceded that, to find error in the

23

trial court's action, this Court would be required to reweigh the evidence and make determinations as to the credibility of the witnesses and their testimony.

"[T]he credibility of witnesses and the weight to be accorded their testimony are questions for the fact finder." Saunders v. Commonwealth, 242 Va. 107, 113, 406 S.E.2d 39, 42, cert. denied, 502 U.S. 944 (1991). Where the jury has seen and heard the witnesses and assessed their credibility and the weight of their testimony, its determination of the facts will not be overturned on appeal unless it is plainly wrong or without evidence to support it. Code § 8.01-680.

Thus, while Atkins may selectively craft an interpretation of the evidence to fit his claims of innocence, and attack the credibility and motivation of Jones and Burton, the trial court, and this Court on appeal, may not substitute its own judgment for that of the jury where a reasonable interpretation of the evidence supports the verdict. Here, the evidence when viewed in its entirety supports the jury's determination that, beyond a reasonable doubt, Atkins was directly responsible for Nesbitt's death and that Atkins was the triggerman. Accordingly, the trial court did not err in refusing to set aside the conviction for capital murder.

24

F. The Verdict Form[7]

Atkins asserts that the jury was not properly "instructed" during the penalty phase because the verdict form failed to provide the jury with the option of sentencing Atkins to life imprisonment upon a finding that neither of the aggravating factors of future dangerousness or vileness was proven beyond a reasonable doubt. We agree.

It is a well established rule that under normal circumstances a trial court is under no obligation to amend or correct an instruction that contains a misstatement of law. However, "when the principle of law is materially vital to [the] defendant in a criminal case, it is reversible error for the

---

[7]This issue was raised in assignment of error 19, which asserts errors in the instruction of the jury in both the guilt phase with respect to accomplice testimony, and in the penalty phase on the issue discussed herein. During oral argument of this appeal, Atkins' counsel conceded that he had not proffered an instruction on accomplice testimony at the conclusion of the guilt phase or objected to the trial court's failure to give such an instruction sua sponte and, thus, that the issue was not properly preserved for appeal. Rule 5:25.

In addition, the Commonwealth asserts on brief that assignment of error 19 is inadequate to encompass a challenge to the verdict form because a verdict form is not an "instruction" to the jury, but is merely a tool to aid the jury in rendering its verdict. However, during discussion of this issue at trial, the trial court, the Commonwealth, and Atkins' counsel used the terms "verdict form," "finding form," and "finding instructions" interchangeably. Moreover, in this context, the term "instruction" is sufficiently broad to cover any statement of the law given by the trial court to the jury, which would necessarily include the written verdict form required by Code § 19.2-264.4(D).

trial court to refuse a defective instruction instead of correcting it and giving it in the proper form." Whaley v. Commonwealth, 214 Va. 353, 355-56, 200 S.E.2d 556, 558 (1973); accord Bryant v. Commonwealth, 216 Va. 390, 392-93, 219 S.E.2d 669, 671-72 (1975). Clearly, it is materially vital to the defendant in a criminal case that the jury have a proper verdict form. Moreover, Atkins submitted a proper verdict form, as required by Code § 19.2-264.4(D) and, thus, there can be no question that the trial court, while having the discretion to elect between the two forms proffered to it, had the duty to give the jury a proper verdict form. It was the Commonwealth's verdict form that was erroneous and, thus, when the trial court accepted the Commonwealth's assertion that the order of sentencing options in its form was preferable, it was the Commonwealth, and not Atkins, that placed the trial court in the position of erring when it failed to correct the omission in the Commonwealth's form.[8]

---

[8]We note further that, while not raising a precise objection to the Commonwealth's proposed verdict form at the time it was selected by the trial court, Atkins' counsel consistently stated his preference for the form he had submitted to the trial court. Cf. Pilot Life Insurance Co. v. Karcher, 217 Va. 497, 498, 229 S.E.2d 884, 885 (1976)(where a party proffers an alternative instruction that is a correct statement of the law, this, without more, will be adequate to preserve for appeal a challenge to the instruction actually given).

In the present case, the Commonwealth represented to both the trial court and Atkins' counsel that its proposed verdict form was "the same as the Defense's" except that the alternative findings varied in order. This simply was not accurate. The Commonwealth's form contained no alternative finding permitting the jury to impose only a life sentence if neither future dangerousness nor vileness had been proven beyond a reasonable doubt. Thus, each of the Commonwealth's alternative verdicts required the jury to find at least one of the aggravating factors to have been present before imposing a sentence of either death or life imprisonment. Although neither the trial court nor Atkins' counsel noted the discrepancy between the Commonwealth's proposed verdict form and Atkins' form, Atkins' counsel was entitled to rely upon the Commonwealth's representation that there was no discrepancy between the forms and it had merely varied the order of the findings from that in Atkins' form.

The trial court's use of the Commonwealth's form resulted in the jury receiving a verdict form which was incomplete and which did not comport with the correct statement of law given to the jury by the trial court in its first instruction. We need go no further in our analysis to determine whether the jury in fact was left with the impression, contrary to the trial court's instruction, that it was required first to find that at least

27

one of the aggravating factors was present.  The jury was presented with a confusing situation in which the trial court's instructions and the form the jury was given to use in discharging its obligations were in conflict.

For these reasons, we will set aside the sentence of death imposed by the jury and remand the case to the trial court for a new penalty proceeding.

G. Reopening of Commonwealth's Case in the Penalty Phase

Asserting that the Commonwealth failed to introduce any evidence of vileness prior to resting its case during the penalty phase, Atkins contends that the trial court erred in failing to strike the Commonwealth's evidence as to that aggravating factor and instead permitting the Commonwealth to reopen its case in order to reintroduce the exhibits used in the guilt phase to establish the vileness of the crime.  Because of the ultimate disposition we make in this appeal, this issue is moot.  We note, however, that because Code § 19.2-264.4(B) requires that the sentencing jury consider "the circumstances surrounding the offense" in determining punishment, the Commonwealth will be permitted to reintroduce such evidence on remand as is relevant to prove the existence of either aggravating factor.

H. Statutory Review of Death Penalty

Because we have determined that there was reversible error in the penalty phase of Atkins' trial which will necessitate a remand to the trial court, we need not consider at this time "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Code § 17.1-313.[9]

## IV.
## CONCLUSION

For the reasons stated, we find no reversible error in the guilt phase of Atkins' trial, and, accordingly, we will affirm Atkins' conviction for capital murder.  Because there was error in the penalty phase of the trial with respect to the imposition of the death penalty, we will reverse the sentence of death and remand the case to the trial court for a new penalty proceeding on the capital murder conviction.

Affirmed in part,
reversed in part,
and remanded.

---

[9]Title 17.1 superseded former Title 17 effective October 1, 1998 and prior to the argument of this appeal. The current statute, Code § 17.1-313, provides for review by this Court in the same manner as the now superseded provisions of Code § 17-110.1, the statute under which the parties briefed the appeal.

29