**UPON REHEARING**

Present: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, Lemons, and Agee, JJ.

MICHAEL W. LENZ

v.  Record No. 012883    OPINION BY JUSTICE ELIZABETH B. LACY
                                    March 5, 2004
WARDEN OF THE SUSSEX I
STATE PRISON

UPON A PETITION FOR A WRIT OF HABEAS CORPUS

In this case we granted a rehearing to the Warden to consider whether trial counsel were ineffective because they did not object to the verdict form given to the jury in the sentencing phase of petitioner's capital murder trial.  The Warden argues that the verdict form the jury considered was proper under this Court's holding in Atkins v. Commonwealth, 257 Va. 160, 178, 510 S.E.2d 445, 456 (1999), and that trial counsel could not have been ineffective for failing to anticipate this Court's subsequent decision in Powell v. Commonwealth, 261 Va. 512, 545, 552 S.E.2d 344, 363 (2001), requiring that the jury receive a verdict form that specifically states that a life sentence may be imposed even after finding one or both aggravating circumstances.  The Warden is correct.

In Atkins the jury was not given a verdict form that allowed it to impose a life sentence if the Commonwealth proved neither of the aggravating factors beyond a reasonable

doubt. 257 Va. at 178-79, 510 S.E.2d at 456-57. The defense

had offered the statutory verdict form, Code § 19.2-264.4,

that allowed this sentencing option, but the trial court

refused that form. Id. at 171-72, 510 S.E.2d at 452. We held

that the total absence of any jury verdict form allowing

imposition of a life sentence if neither of the aggravating

factors was proven was reversible error. Id. at 179, 510

S.E.2d at 457. We noted that, had the trial judge selected

the statutory verdict form Atkins' counsel offered, the

missing sentencing option would have been submitted to the

jury. Id. at 178, 510 S.E.2d at 456. That issue is not

present in this case, however, because the jury received the

statutory verdict form absent in Atkins.[1]

The issue petitioner raises here is whether the verdict

form must specifically provide the option of imposing a

sentence of life when the Commonwealth has established one or

both aggravating factors. We addressed that issue for the

---

[1] The verdict form before the jury in the sentencing phase
of petitioner's capital murder trial comports with the
language contained in Code § 19.2-264.4(D):

    We, the Jury, on the issue joined, having
    found the defendant guilty of Capital
    Murder, as charged in the indictment, and
    having considered the evidence in
    aggravation and mitigation of the offense,
    fix his punishment at imprisonment for life.

2

first time in Powell. 261 Va. at 542, 552 S.E.2d at 361.

Powell was not decided until after petitioner's capital murder

trial concluded. Therefore, trial counsel could not have been

ineffective for failing to anticipate this Court's subsequent

decision in Powell, Kornahrens v. Evatt, 66 F.3d 1350, 1360

(4th Cir. 1995), and petitioner is not entitled to a new

sentencing hearing on that basis.

In light of this holding, we must address the claims in

petitioner's petition for writ of habeas corpus relating to

the sentencing phase of his capital murder trial.[2] These

claims are allegations of improper jury contacts and

communications in connection with his sentencing hearing,

Claims I and II, and various allegations of ineffective

assistance of counsel in the sentencing proceeding, Claim VII.

## CLAIMS I AND II

In Claim I, petitioner asserted that the bailiff in his

trial provided ex parte answers to jurors' questions about the

court's sentencing instructions and, in Claim II, that Juror

Anita J. Durrett was improperly seated and that one or more

jurors consulted a Bible in the jury room during sentencing

_____

[2] Petitioner raised ten claims in his petition for writ of habeas corpus. In our original opinion we specifically declined to address petitioner's claims relating to his prior sentencing hearing and dismissed all his claims except the claim involving the verdict form. Lenz v. Warden, 265 Va. 373, 379, 381-82, 579 S.E.2d 194, 197-99 (2003).

3

deliberations.  We referred Claims I and II to the Circuit Court of Augusta County for an evidentiary hearing by order entered June 17, 2002.

Following the evidentiary hearing on August 9, 2002, the circuit court issued a letter opinion stating its findings of fact, conclusions of law, and recommendations.  The circuit court recommended rejecting both claims, finding that the petitioner did not carry his burden of proof to establish that the jury had asked the bailiff questions concerning their sentencing instructions, that there was no evidence that Juror Durrett was biased in favor of the death penalty, and that there was "no reasonable possibility that the jury verdict was influenced by an improper communication in the form of a quotation from the Bible."

Petitioner filed a brief with this Court raising a number of objections to the findings and conclusions of the circuit court.  The Commonwealth filed a brief responding to petitioner's arguments and supporting the circuit court's conclusions.  Petitioner filed a reply brief.[3]

We begin by addressing two preliminary matters:  the Commonwealth's assertion that Claims I and II are procedurally barred by the rule in Slayton v. Parrigan, 215 Va. 27, 205

---

[3] Petitioner also filed a supplemental brief that was rejected by order dated February 23, 2003.

4

S.E.2d 680 (1974), and petitioner's complaint that the circuit court erred by limiting the evidentiary value of affidavits submitted in the case.

## A.  Procedural Bar

The Commonwealth asserts that Slayton precludes consideration of petitioner's Claims I and II in this habeas corpus proceeding because petitioner did not raise those claims at trial and on direct appeal.  We disagree.

Slayton holds that one may not use a habeas corpus proceeding as a substitute for appeal.  215 Va. at 29, 205 S.E.2d at 682.  Slayton makes clear, however, that this procedural bar operates when the petitioner "has been afforded a fair and full opportunity to raise and have adjudicated" the constitutional issue at trial and on appeal.  Id.  If the petitioner did not have that "fair and full opportunity" during his criminal trial and direct appeal, the rule in Slayton does not apply.  See DiPaola v. Riddle, 581 F.2d 1111, 1113-14 (4th Cir. 1978).

In this case, the Commonwealth asserts that the Slayton bar operates because the petitioner could have procured information from the jurors regarding communications with the bailiff and the presence and use of the Bible during sentence deliberations "sooner – immediately after trial, in fact." Adopting the Commonwealth's rationale for applying the Slayton

5

bar in this case would in effect impose a requirement on defense counsel to poll jurors and any other persons involved with the criminal trial immediately following the trial, often at the same time that counsel is involved in filing post-trial motions and preparing for appeal. Failure to conduct such a poll or investigation in every case would then subject counsel to an ineffective assistance of counsel claim in a habeas corpus proceeding. We decline to impose such a requirement. Absent any indication that counsel or petitioner knew or should have known of the complained of conduct at a time when the trial court could address the misconduct allegations, the procedural bar in Slayton does not apply.

In this case there is no evidence that trial counsel or petitioner had any information indicating that counsel should have interviewed the jury members or the bailiff, and the Commonwealth suggests none. Accordingly, we conclude that Slayton does not bar petitioner's Claims I and II.

## B. Affidavits

In its opinion letter, the circuit court stated that it based its findings on the testimony of the witnesses at the hearing and that it relied on the affidavits the petitioner and respondent filed only as they affected the credibility of the witnesses.

6

Petitioner asserts that the trial court erred in not considering the affidavits as substantive evidence. He suggests that because Code § 8.01-660 allows the use of affidavits as evidence in a habeas corpus proceeding and because at least some of the affiants did testify, the circuit court should have either found that the affidavits were credible testimony or resolved any credibility questions he had through cross-examination of the testifying affiants.

Code § 8.01-660 provides that

> In the discretion of the court or judge before whom the petitioner is brought, the affidavits of witnesses taken by either party, on reasonable notice to the other, may be read as evidence.

This statute makes consideration of affidavits as substantive evidence a matter in the court's discretion. Accordingly, we apply an abuse of discretion standard when reviewing the circuit court's decision regarding the use of the affidavits in this case.

The circuit court identified a number of reasons why it did not consider the affidavits as substantive evidence, including that they had no indicia of inherent credibility, were taken without benefit of a transcript, and were taken a significant time after the events occurred. Based on this record, we cannot say that the circuit court abused its

7

discretion in refusing to consider the affidavits as substantive evidence.

We now turn to the circuit court's findings of fact and conclusions of law regarding the claims that were the subject of the evidentiary hearing. When we refer a petition for a writ of habeas corpus involving a capital murder case to a circuit court for an evidentiary hearing, we give deference to the circuit court's factual findings and consider those findings binding upon this Court unless they are plainly wrong or without evidence to support them. Hedrick v. Warden, 264 Va. 486, 496, 570 S.E.2d 840, 847 (2002). We review de novo any questions of law or mixed questions of fact and law that the circuit court addressed. Id.

C. Improper Communications with the Bailiff

Responding to jury inquiries regarding sentencing instructions without notifying defendant or his counsel violates a defendant's Sixth Amendment right to counsel. Rogers v. United States, 422 U.S. 35, 39-40 (1975); Remington v. Commonwealth, 262 Va. 333, 360, 551 S.E.2d 620, 636-37 (2001); Palmer v. Commonwealth, 143 Va. 592, 605, 130 S.E. 398, 402 (1925). Petitioner claimed that he was deprived of his Sixth Amendment right because the bailiff provided ex parte responses to juror questions regarding the instructions the jurors received in the sentencing phase of his capital

murder trial.  Petitioner has the burden to establish that such improper contact occurred.  Stockton v. Virginia, 852 F.2d 740, 743 (4th Cir. 1988).

As recited above, the circuit court found no credible evidence to support petitioner's allegations of improper contact and rejected petitioner's misconduct claim. Petitioner challenges these findings, asserting that the "most credible evidence" shows that the jurors had questions about the sentencing instructions during deliberations and the bailiff answered some of their questions.  Petitioner's attack on the sufficiency of the evidence relies wholly on statements in petitioner's affidavits; however, as we stated above, the circuit court did not and was not required to consider those affidavits as substantive evidence.

A review of the record shows that some of the jurors and the bailiff could not recall whether the bailiff was asked any questions at all; other jurors recalled that they asked the bailiff some questions.  No juror testified that any of the questions that may have been asked related to the trial court's instructions.  Thus, the circuit court's factual findings are neither plainly wrong nor without evidence to support them and therefore are binding on us.  Hedrick, 264 Va. at 496, 570 S.E.2d at 847.

Accordingly, we find that petitioner failed to carry his burden to show that an improper contact occurred, and we reject this claim.

### D. Extraneous Influence

The second claim we referred to the circuit court for an evidentiary hearing was that petitioner was denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because jurors read from and relied upon passages in the Bible in making their sentencing determination. The United States Supreme Court set out the following standard for evaluating a claim of extraneous jury contact:

> In a criminal case, any private communication, contact or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Remmer v. United States, 347 U.S. 227, 229 (1954).

The circuit court found as a matter of fact that one juror "had at least one Bible and perhaps a 'Woman's Devotional' with her in the jury room during the deliberations in the penalty phase of the trial." The circuit court also

10

found that the Bible was open during deliberations, that one juror read from it, and that other jurors looked at it. The circuit court assumed that those jurors who looked at the Bible did read from it but found that there was no evidence showing what Bible passage or passages were read.

The circuit court, applying Remmer, Burch v. Corcoran, 273 F. 3d 577 (4th Cir. 2001), and Stockton, concluded that, absent any probative evidence that a juror relied on the contents of a passage in the Bible in making the sentencing decision, there was "no reasonable possibility that the jury verdict was influenced by an improper communication in the form of a quotation from the Bible."

Petitioner asserts that the circuit court erred in a number of particulars in finding that there was no indication that the "jury verdict was influenced by an improper communication in the form of a quotation from the Bible." The petitioner first complains that the circuit court's factual findings ignore various jurors' testimony that the Bible was read aloud and was consulted for purposes of determining what punishment was appropriate for the crime of murder. As with his complaints regarding the factual findings regarding communications with the bailiff, the petitioner bases this challenge on statements in the petitioner's affidavits, not on testimony at the evidentiary hearing. As we have previously

11

stated, the trial court was not required to credit the statements in the affidavits.  Our review of the record shows that the circuit court's factual findings are consistent with the hearing testimony and are not plainly wrong.  Thus, those factual findings are binding upon us.  Hedrick, 264 Va. at 496, 570 S.E.2d at 847.

The petitioner also complains that the circuit court improperly misallocated the burden of proof in his claim of extraneous jury contact.  The Remmer presumption of prejudice arises upon a showing of two elements:  that an extraneous contact with or by a member of the jury took place and that such contact was "about the matter pending before the jury." Remmer, 347 U.S. at 229.  The character of the extraneous contact must "reasonably draw into question the integrity of the verdict."  Stockton, 852 F.2d at 743.  Once the petitioner shows both elements, the presumption arises, the petitioner is relieved of proving actual prejudice, and the burden shifts to the government to establish that the potentially prejudicial contact was harmless.  Remmer, 347 U.S. at 229.

In this case, the petitioner established the first element but did not establish the second:  the relevance of the contact to the pending matter.  The circuit court found that extraneous material, the Bible, was present in the jury room during deliberations, but the circuit court also found

12

that there was no evidence of what Bible passages were read. Implicit in this finding is a determination that no evidence showed that jurors read Bible passages relating to the sentencing decision. Thus, petitioner did not establish that the "contact" with the Bible was "about the matter pending before the jury."

Petitioner concedes that no evidence shows which Bible passages were read. Nevertheless, petitioner argued strenuously to this Court that "the evidence clearly established that several of the jurors read passages regarding the appropriate punishment for murder." Our review of the record indicates otherwise.

At the evidentiary hearing, petitioner read Juror Durrett a portion of the affidavit she gave to the petitioner in which she stated that she had a Bible with her during the trial and that while deliberating on the sentence "some jurors were able to point to passages in the Bible that support the death penalty for anyone who kills another person." In response to petitioner's questions about these statements, Juror Durrett testified that she could not recall which jurors had asked about the Bible, that another juror had identified a book of the Bible which contained information about death, that jurors had referred to the location of passages in the Bible from memory, that she had her Bible in the room but did not think

13

that she had it open during deliberations, and that no one had "read out loud" from the Bible.

Juror Sallie Zirkle testified that a "female juror" did read from the Bible, but Juror Zirkle could not remember which juror did the reading, what verse was read, why it was read, or if the reading occurred during the jury's deliberations regarding guilt or sentencing.

Juror Barbara Pack testified that, while a Bible was on the table in the jury room, she did not know if anyone other than the owner of the Bible read or looked at the Bible. Juror Pack "assumed" the owner of the Bible was reading it when she "looked" at it.

Juror John M. Harmon testified that nothing was read aloud from the Bible. He did not know what the owner of the Bible read, if anything, when "looking through" it. Juror Joan Lafferty testified that the Bible was a Women's Devotional Bible and that neither the owner nor any other juror read from this book.

The only reference to a matter related to the sentencing decision was Juror Durrett's testimony that a juror recited, by memory, the location of a Bible passage relating to the appropriate punishment for murder. This is not evidence that the jury consulted, read aloud, or discussed the referenced passage or any other Bible passage.

14

The circuit court's implicit and explicit factual findings – that there was no evidence establishing that the jurors' contact with extraneous material involved the "subject matter" before the jury – are supported by the record and not plainly wrong. Based on these factual findings, we agree that the petitioner failed to carry his burden of showing an extraneous contact with the jury about the pending sentencing decision such that the integrity of the jury's verdict was reasonably drawn into question. Therefore, petitioner has not made the threshold showing entitling him to the presumption of prejudice. See Burch, 273 F.3d at 591.

Petitioner also challenged the seating of Juror Durrett based on the statement in her affidavit that the "Bible says that the death penalty is the appropriate punishment for murder." This statement, he asserts, shows that seating her violated the principles set forth in Morgan v. Illinois, 504 U.S. 719, 729 (1992), because she would automatically vote for the death penalty in every case. The circuit court rejected this claim. After reviewing Juror Durrett's voir dire testimony during the capital murder trial, the circuit court found that she "was specifically asked whether she would consider both alternatives available to her, either life without parole or death, and that she answered she would." Based on this finding, the circuit court concluded that there

15

was no support for the proposition that Juror Durrett was biased in support of the death penalty and recommended that this claim be denied.

We also reject petitioner's claim that Juror Durrett was biased in support of the death penalty. The record supports the circuit court's findings of fact. The single statement in her affidavit regarding an "appropriate punishment" is insufficient evidence upon which to find that Juror Durrett herself concurred with the statement and that she would automatically apply this "appropriate punishment" in every capital murder case. During voir dire, Juror Durrett was specifically asked whether she had any religious, philosophical, or moral beliefs that would prevent her from imposing the death sentence and she responded "no." She was also asked if she would consider both life imprisonment without parole and death as alternative penalties and she responded that she would. Accordingly, we conclude that seating Juror Durrett did not violate the requirements of Morgan v. Illinois.

Accordingly, we reject Claim II.

### CLAIM VII

In Claim VII, petitioner asserted that he was denied effective assistance of counsel in the sentencing phase of his capital murder trial because counsel failed to investigate and

16

present the circumstances of the offense, evidence regarding petitioner's religion, and evidence regarding petitioner's background; failed to develop relevant evidence regarding petitioner's mental illness, to investigate the implications of petitioner's medications, and to obtain the assistance of an independent expert; and unreasonably failed to seek additional time to investigate, all of which individually and collectively prejudiced him.

To prevail on these claims, petitioner bears the burden of showing that his counsel's performance was objectively deficient and that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687 (1984). In applying the performance prong of this test, the issue is whether counsel's acts or omissions were unreasonable in light of all the circumstances. Id. at 688. That determination begins with a strong presumption that counsel's actions fall within the wide range of adequate professional assistance, and this presumption bars an inadequate assistance claim if the complained of conduct might have been the result of tactics or strategy. Id. at 689; Darden v. Wainwright, 477 U.S. 168, 185-86 (1986).

The "prejudice" prong of the Strickland test requires the petitioner to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of

17

the proceeding would have been different."  466 U.S. at 694.

A "reasonable probability" is more than a "possibility" of

prejudice; it is a "probability sufficient to undermine

confidence in the outcome."  Id.  The errors must have

"actually had an adverse effect on the defense."  Id. at 693.

Further, in applying this two-prong test, we need not

determine whether counsel's performance was deficient before

addressing the prejudice prong.  If the petitioner fails to

show the requisite prejudice, we need not scrutinize counsel's

performance.  Id. at 697.

A.  Failure to Seek Additional Time to Investigate

On April 17, 2000, counsel for petitioner requested a

continuance based on difficulties they were experiencing in

meeting with petitioner and contacting other potential

witnesses.  The trial court granted a two-month continuance.

Counsel did not seek a second continuance.  Petitioner asserts

that his counsel should have sought a second continuance

because of difficulties in obtaining information and testing

regarding petitioner's background.  We reject this claim.

Petitioner recites that "the trial court would have likely

granted" a second continuance if counsel had sought one and

that without the continuance counsel "were . . . unable to

investigate and present all relevant evidence" regarding

petitioner's background, religion, and mental health history.

18

The evidence petitioner proffers in support of this claim is that some experts were not appointed until shortly before trial, and affidavits from his trial counsel and mitigation specialist explaining difficulties in meeting with petitioner and expressing the opinion that "[e]veryone . . . could have used" more time.

Many of the difficulties the mitigation expert experienced in meeting with petitioner were the result of her schedule and location. Even in light of those difficulties, the mitigation expert affirmed counsel's mitigation strategy. There is no evidence that any of petitioner's experts told his counsel that they needed more time. Under these circumstances we cannot say that counsel's failure to seek a second continuance was unreasonable under the circumstances and, accordingly, we reject this claim. Strickland, 466 U.S. at 689.

### B. Failure to Investigate and Present Circumstances of the Offense

Citing affidavits his fellow inmates submitted, petitioner asserts that his trial counsel should have investigated and introduced evidence regarding petitioner's dedication to the Asatru religion, including his belief in, and fear of, "life-threatening black magic," which the victim, Brent H. Parker, allegedly was using against petitioner. Such

19

evidence, petitioner claims, would have demonstrated to the jury that he did not kill Parker because of a depraved mind but because he feared for his life.[4]

We reject this claim. First, the petitioner presented this evidence to the jury through his own testimony. Petitioner testified about the nature of the Asatru religion and his dedication to it as well as his relationship with the victim and the threats the victim made toward him.

Petitioner also asserts that the inmate's testimony would have shown that the killing was not related to petitioner's depravity of mind, one of the grounds for establishing the vileness aggravating factor. However, this assertion does not address the other grounds supporting a finding of vileness – torture and aggravated battery. The evidence that the victim was stabbed 68 times supports a finding of vileness based on torture or aggravated battery. Furthermore, the jury also found that petitioner would be a future danger to society. Nothing in the alleged missing testimony would have affected that finding.

Accordingly, we reject petitioner's claim because he failed to show that, had the additional testimony he cites

_____

[4] We do not treat petitioner's arguments as asserting a claim of self-defense. At issue here is the sentencing proceeding, at which point the jury had already rejected such claim.

been presented to the jury, there would have been a reasonable probability of a different result.  Strickland, 466 U.S. at 694.

### C.  Failure to Investigate and Present Relevant Evidence Regarding Petitioner's Religion

Petitioner claims that presenting evidence of the Asatru religion and his immersion in it solely through his own testimony was insufficient to inform the jury of the true nature of the religion and its significance in his life. Without receiving this information from other witnesses such as fellow inmates or acquiring an understanding of prison dynamics from an expert in prison life, petitioner asserts, the jury was left with the "sole impression that Lenz's religion was nothing more than a dangerous and scary cult." If the jury had such information, petitioner concludes, "there is a reasonable probability that the jury would not have sentenced Lenz to death."

We reject this claim.  Nothing in the record suggests that the prison life expert petitioner asserts counsel should have called, James E. Aiken, had any knowledge of the Asatru religion or of petitioner's involvement in it.  The record shows only that Aiken had qualified as an expert in "prison operations and classifications" and would have testified

21

regarding the probability of petitioner's future dangerousness.

The record does show that petitioner called as a witness the prison psychologist who had interviewed him following the murder. The witness described some of the tenets of the Asatru religion. The witness testified that he believed petitioner was sincere in his dedication to this religion.

The record shows that petitioner's trial counsel did attempt to put on the dynamics of the prison atmosphere and religious groups through the prison psychologist. Counsel ceased that line of questioning when the witness' answer indicated a lack of violence connected with the Asatru religious group and when the trial court barred further inquiries regarding violent acts by other religious groups in the prison. Counsel's decision to end this line of questioning apparently was a strategic decision based on the court's ruling and the testimony of the prison psychologist.

Similarly, the inmate testimony petitioner asserts that the jury should have heard did not involve the substance of the Asatru religion. That testimony described the contrast between petitioner's immersion in his religion and the victim's aggressive, bullying, non-religious character, as well as the relationship between petitioner and his victim. Petitioner himself testified to this evidence, and as

22

previously stated, other testimony related to the sincerity of petitioner's religious beliefs.

This record does not support a finding that petitioner's counsel acted unreasonably in light of all the circumstances or that the failure to present testimony of other inmates and James Aiken raises a reasonable probability that the result of the sentencing proceeding would have been different. Strickland, 466 U.S. at 689, 694.

### D. Failure to Properly Investigate and Present Relevant Evidence Regarding Petitioner's Background

Petitioner complains, in part, that trial counsel were ineffective because they failed to investigate and develop information about petitioner's family history of alcoholism, drug abuse, and mental illness. We reject this part of the claim.

Petitioner obtained an affidavit from trial counsel stating that efforts were made to locate petitioner's biological father but that they "never located [petitioner's] biological father, or any other members of his biological paternal family." Counsel did not make a decision that finding these persons was unnecessary, compare Wiggins v. Smith, ___U.S. ___, 123 S.Ct. 2527 (2003); rather their investigation of these matters was unsuccessful. Under these circumstances,

23

we cannot say that counsel's actions "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

Petitioner also complains that his trial counsel were ineffective because they did not present detailed information regarding his psychiatric institutionalizations, diagnoses, and treatments. We reject this claim also.

First, petitioner does not assert that counsel were deficient in failing to investigate his background. Petitioner acknowledges that counsel had obtained the records relevant to the evidence he now asserts should have been presented to the jury. "[C]ounsel had . . . stacks of records regarding Lenz's treatment and diagnoses." He also acknowledges that both petitioner and his mother testified regarding his childhood and institutionalizations. That testimony provided the jury with the following information.

Petitioner's mother met his biological father, Michael W. Stagenga, while Stagenga was a student at the United States Naval Academy, and they married upon Stagenga's graduation. When petitioner was born in 1964, Stagenga was stationed in Vietnam. Petitioner's parents divorced in 1967, in part because his mother was concerned that his father had a drinking problem.

Petitioner and his mother returned to Virginia. His mother married Bill Lenz, a Navy helicopter pilot, in April

24

1968.  Bill Lenz wanted to and eventually did adopt petitioner.  Mrs. Lenz testified that Bill Lenz never told petitioner that "he loved him" and was intense and strict with petitioner.  Bill Lenz told Mrs. Lenz not to "hug" petitioner all the time.

The Lenz family moved a number of times as Bill Lenz's station assignments changed.  In first grade, Mrs. Lenz was told that her son was "rough on the play ground" and "fidgety in class."  When he was in second grade, petitioner's brother Lance was born.

When petitioner was in fourth grade, his parents sent him to San Diego Children's Home, a day school, because he was having trouble controlling his anger.  The family went to counseling although Bill Lenz "didn't like it."  The next year the family returned to Virginia when Bill Lenz left the Navy and joined the Secret Service.  Petitioner attended public schools in Woodbridge and needed no special help.  He was involved in scouting, soccer, and church activities.  Mrs. Lenz testified that petitioner and Bill Lenz had no close father-son relationship and that Bill Lenz disciplined petitioner by making him go to his room for long periods of time.  There was no physical abuse.

When petitioner was 14 years-of-age, his mother was looking after a neighbor's house and car while the neighbor

25

was away.  Petitioner and a friend took the car keys and drove the car around.  When confronted, petitioner was "scared", and, according to Mrs. Lenz, held a kitchen knife and threatened to take his own life.  As a result of this incident, petitioner's parents admitted him to Potomac Hospital, a crisis center, in Woodbridge, Virginia.  He was transferred to Dominion Psychiatric Treatment Center (Dominion) in Falls Church, Virginia, a few weeks later because he was showing depression and repressing anger.  The family participated in counseling, although Bill Lenz was embarrassed "about it" and didn't like doing it.

A few months after petitioner was released from Dominion, he and a boy he had met at Dominion burglarized a home and stole some jewelry.  Petitioner was returned to Potomac Crisis Center at the insistence of Bill Lenz.  At the hearing on the burglary charges, the juvenile court judge sent petitioner to Commonwealth Psychiatric Hospital (Commonwealth) in Richmond as an alternative to jail.  The family participated in counseling while petitioner was at Commonwealth.

When released from Commonwealth, petitioner was enrolled in Gladden School, a school for boys with behavioral problems. That school closed.  Petitioner again got "into trouble" and this time was sent to Beaumont Learning Center.  He acquired his general equivalency diploma while at Beaumont.  After one

trip home from Beaumont, petitioner did not return to Beaumont as required. He went to Virginia Beach for two days.

When petitioner was released from Beaumont, his parents had moved to New Jersey. He went to New Jersey and enrolled in a small college. After a "short time," petitioner was in "trouble" again and sentenced to jail in New Jersey. When released, his mother, who had moved to Iowa, returned to New Jersey and helped him find a place to stay there. Eventually petitioner returned to Virginia.

Petitioner complains that this evidence is inadequate because it does not recite the specific diagnoses and treatments he underwent in the various institutions. However, those records show that at age 14 petitioner tested at or above grade level in all tested areas but spelling, had a verbal IQ of 112, a performance IQ of 117 and a full scale IQ of 116. He was classified in the bright to normal range. His psychological evaluations showed that he had poor impulse control, exhibited destructive behavior, had been using "pot" for over a year, had used LSD, and had used cocaine for five months before he was placed in Dominion. Petitioner also admitted he was "dealing" to finance his drug supply. He was evaluated as not psychotic but "demanding, infantile, depressed and angry." The evaluator recommended help in improving his self-esteem and controlling his anger. Later evaluations

27

reinforced the notion that petitioner was "above average" in intelligence but continued to abuse drugs and alcohol.

In light of the information contained in the reports and evaluations from the various institutions in which petitioner received treatment, counsel's decision not to present more detail regarding those reports was not unreasonable.  The particulars of those reports would have represented a "two edged sword" that counsel often confront when constructing the strategy most likely to assist rather than harm a client. Barnes v. Thompson, 58 F.3d 971, 980-81 (4th Cir. 1995)(cross-purpose evidence capable of aggravation and mitigation).

Finally, petitioner has failed to show what the jury could have heard that would have had a reasonable probability of changing the sentencing result.  The jury heard about petitioner's unloving and demanding step-father, his natural father's drinking problem, his suicidal tendencies, his low self-esteem and feelings of worthlessness, and his own extensive drug and alcohol use.  The possibility that description of these facts could have been presented in more detail does not support a finding of a reasonable probability that the jury would have reached a different result. Strickland, 466 U.S. at 694.

> E.  Failure to Develop Relevant Evidence Regarding Petitioner's Mental Illness

28

Petitioner claims that his social and psychiatric history indicates that he suffers from a "cognitive dysfunction" and that this dysfunction leads to low self-esteem, suspiciousness, paranoia, and eccentric behavior – actions that were documented by prior evaluations of petitioner. Such dysfunction, petitioner asserts, "helps explain" petitioner's loss of control and extreme reaction to the victim's behavior. Thus, petitioner concludes, his counsel were ineffective because they did not sufficiently develop this information regarding his mental illness.

Again we reject this claim. We note that petitioner is not asserting that counsel failed to engage in any investigation of petitioner's mental state; rather, petitioner's complaint is that counsel's development and presentation of the evidence was inadequate.

Petitioner's argument relies primarily on the affidavit of a clinical neuropsychologist who tested petitioner and reviewed his records years after the capital murder trial. At the time of trial, petitioner had never been diagnosed with a mental illness of any type. Petitioner's psychiatric evaluations had identified psychological problems but never suggested a mental illness or "cognitive dysfunction" amounting to a mental illness.

29

Counsel cannot be considered ineffective for failing to develop a "mental illness" theory to use in mitigation when such a condition had not even been suggested by any expert or individual who had evaluated petitioner.  See Poyner v. Murray, 964 F.2d 1404, 1418-19 (4th Cir. 1992).

F.  Failure to Obtain Assistance of an Independent Expert

At trial, petitioner sought the assistance of James Aiken as an expert witness on the operation and classification of inmates in the Virginia prison system.  The trial court denied petitioner's motion to appoint this expert, saying that the services of the expert were "expensive" and that the information petitioner sought was available from persons who were in Virginia and who could "tell you better how it's done."  Counsel for petitioner noted his objection but made no further argument.  At trial, petitioner called the Virginia Department of Corrections Director of Operations and the Assistant Warden of Operations at Red Onion Prison to testify on the system of prisoner classification and security.

Petitioner argues that under Ake v. Oklahoma, 470 U.S. 68 (1985), he was entitled to an independent expert and that the expert petitioner sought could have assisted in "preparing a defense to the Commonwealth's case for future dangerousness" in the context of a prison environment.  Such assistance, petitioner argues, would not have been forthcoming from

30

employees of the Commonwealth's prison system.  Counsel's failure to advise the trial court of the need for this independent expert constituted ineffective assistance of counsel, according to petitioner.

We reject this claim.  Trial counsel appealed the denial of petitioner's motion for the appointment of the expert at issue on direct appeal.  This Court resolved the issue, holding that Ake did not require the trial court to appoint the expert. Lenz v. Commonwealth, 261 Va. 451, 462, 544 S.E.2d 299, 305 (2001).

To the extent petitioner is complaining that counsel's ineffectiveness is based on their failure to make the argument that the expert would be testifying not only to prison classifications and operation but also opining on petitioner's future dangerousness in the context of a prison setting, we also reject the claim.  We have held that Code § 19.2-264.2 does not limit the consideration of whether the defendant would pose a continuing threat to society to a "prison society" because a defendant would be sentenced to life imprisonment without parole.  Lovitt v. Commonwealth, 260 Va. 497, 517, 537 S.E.2d 866, 879 (2000).  While Lovitt was decided one month after petitioner's sentencing proceeding, we cannot conclude that counsel was ineffective for failing to advance an argument that we have subsequently rejected.

31

## G. Failure to Investigate Implications of Petitioner's Medications

Petitioner asserts that he was being treated with the steroid prednisone and the antihistamine Benadryl at the time of the murder and that trial counsel was ineffective for failing to seek expert assistance to determine if these medications negatively affected petitioner.

We reject this claim. Petitioner's mitigation theory revolved around the sincerity of his religious beliefs and his feelings of low esteem and repressed anger stemming from his relationship with his step-father. Petitioner never suggested that he was not in control of his actions when he stabbed and killed Parker or that the sincerity of his religious beliefs was the product of some adverse reaction to medication. Decisions regarding trial strategy often require rejection of other potential strategies. The course of actions petitioner suggests in this habeas proceeding is inconsistent with the trial strategy his trial counsel elected. We cannot conclude that trial counsel's actions were deficient for failing to make the argument petitioner suggests. Strickland, 466 U.S. at 689.

## H. Cumulative Prejudice

Lastly, petitioner complains that the cumulative effect of trial counsel's actions and omissions during the sentencing phase "individually and cumulatively, prejudiced Lenz." We

32

reject this claim.  Having rejected each of petitioner's individual claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right to effective assistance of counsel.  Mueller v. Angelone, 181 F.3d 557, 586 n.22 (4th Cir. 1999), Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998).

CONCLUSION

For these reasons, we deny the petition for a writ of habeas corpus.

Writ denied.

JUSTICE KOONTZ, with whom CHIEF JUSTICE HASSELL and JUSTICE KEENAN join, dissenting.

I respectfully dissent.  At its core, the issue that Michael W. Lenz raises in this habeas corpus case ultimately evolves from our recent consideration of a defendant's rights in view of the awesome responsibility statutorily entrusted to the jury in a capital murder case to determine whether a defendant shall be sentenced to death or life imprisonment. The jury's determination is aided by two fundamental and pertinent principles.  A death sentence may not be imposed unless the jury finds beyond a reasonable doubt that one or both of the so-called aggravating factors of future dangerousness or vileness have been proven.  However, the jury

may fix the defendant's punishment at life imprisonment even when it finds that one or both of these aggravating factors have been proven.  Code §§ 19.2-264.2 and 19.2-264.4.  In this context, our decision in Atkins v. Commonwealth, 257 Va. 160, 178, 510 S.E.2d 445, 456 (1999), was premised upon the well established rule that "it is materially vital to the defendant in a criminal case that the jury have a proper verdict form" reflecting all of its sentencing options.  In my view, the majority either ignores the rationale of Atkins or unduly limits that rationale to the specific facts of that case.  Our subsequent decision in Powell v. Commonwealth, 261 Va. 512, 552 S.E.2d 344 (2001), illustrates the point that it is reversible error when the jury is not given complete or adequate verdict forms that comport with the correct statement of the law given to the jury by the trial court in its sentencing instructions regarding the sentencing options available to the jury, regardless of the specific manner in which those forms are incomplete or inadequate.  For the reasons that follow, I would vacate Lenz's death sentence and remand the case to the trial court for a new sentencing hearing.

Beyond question, the jury in Lenz's case was not given a verdict form that specifically reflected the jury's option of imposing a life sentence, or a life sentence and a fine of not

34

more than $100,000, even if the jury found that the Commonwealth had proven beyond a reasonable doubt one or both of the aggravating factors necessary for imposing a sentence of death. The trial court was required to provide the jury with a verdict form expressly providing this sentencing option, and we expressly so held in Powell, 261 Va. at 545, 552 S.E.2d at 363.

The Warden in this case misses the mark when arguing essentially that there is no "Atkins error" in the verdict forms given to Lenz's jury because unlike Atkins the jury in Lenz's case was given the statutory verdict form provided by Code § 19.2-264.4. That statutory verdict form was also given to the jury in Powell and there we explained:

> The issue is not whether the jury was provided with the means to discharge its obligation. If that were the only goal, it could be achieved by providing the jury with a generic verdict form and advising the jury to fill in the particulars of the sentence from the instructions. Rather, the issue is whether the jury is likely to be confused where it is instructed that it may impose a sentence other than death if it finds one or both of the aggravating factors have been proven beyond a reasonable doubt, but receives verdict forms that do not expressly state that the jury is allowed to fix a sentence of life imprisonment even though one or both aggravating factors are present.

Id. at 545, 552 S.E.2d at 363. We applied the rationale of Atkins in Powell and the specific deficiency in the verdict

35

forms given to the jury in the former case was not material to our analysis in the latter case.  Id.

The majority does not dispute that, in the absence of the procedural differences in the two cases, Powell would control the verdict form issue raised by Lenz in this case.  In Powell, the inadequacy of the jury verdict forms was an issue raised at trial and preserved for appeal.  Id.  In Lenz's case, the very same issue was not raised at trial and preserved for appeal.  In Lenz's direct appeal we raised the issue, sua sponte, and asked the parties to address it in view of our decision in Atkins.  We ultimately held, however, that the issue was procedurally defaulted under Rule 5:25 because Lenz had neither raised the issue in the trial court nor assigned error to the verdict forms before this Court.  Lenz v. Commonwealth, 261 Va. 451, 472, 544 S.E.2d 299, 311 (2001).  The issue is now before this Court on Lenz's claim that his counsel was ineffective in not preserving the issue of the inadequate jury verdict forms used in his capital murder trial.

Adopting the position asserted by the Warden in Lenz's habeas corpus case, the majority concludes that Lenz's counsel was not ineffective because "trial counsel could not have been ineffective for failing to anticipate this Court's subsequent decision in Powell."  I agree, but counsel did not need to

36

anticipate our decision in Powell.  In my view, trial counsel was ineffective in not recognizing after our decision in Atkins, which was rendered one and one half years prior to Lenz's trial, that it was materially vital to Lenz that the jury be given a proper verdict form reflecting all of its sentencing options.  Specifically, any reasonably effective counsel would have recognized after Atkins that a jury form that did not specifically reflect the jury's option of imposing a life sentence, or a life sentence and a fine of not more than $100,000, even if the jury found that the Commonwealth had proven beyond a reasonable doubt one or both of the aggravating factors necessary for imposing the death sentence, would not comport with the correct statement of law given to the jury by the trial court in its sentencing instructions.  In such a case, the jury would be presented "with a confusing situation in which the trial court's instructions and the form the jury was given to use in discharging its obligations [would be] in conflict."  Atkins, 257 Va. at 179, 510 S.E.2d at 457.  Indeed, that was the reason we raised this issue sua sponte in Lenz's direct appeal.  Our concern was the application of the rationale of Atkins, not the specific manner in which the verdict forms were inadequate in that case, and not the decision we would render in Powell.

In short, in view of this Court's decision in Atkins, Lenz's counsel was ineffective in failing to object to the inadequate verdict form given to the jury at Lenz's capital murder trial. That failure precluded Lenz from having his sentence determined by a jury with verdict forms that reflected all of its sentencing options under the law or receiving relief on direct appeal. Lenz obviously was prejudiced by counsel's failure. Accordingly, I would vacate Lenz's death sentence and remand the case to the trial court for a new sentencing hearing.[*]

---

[*] Because I would remand the case for a new sentencing hearing based upon the claim of ineffective assistance of counsel with respect to the failure to object to the improper verdict form, I would not reach the other issues addressed by the majority and express no opinion thereon.

38