UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges Raphael, Lorish and Frucci
Argued at Arlington, Virginia


DEMETRIUS DOMINIQUE BROWN

MEMORANDUM OPINION* BY
v.        Record No. 0532-24-4        JUDGE STEVEN C. FRUCCI
SEPTEMBER 30, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF WINCHESTER
Brian M. Madden, Judge

(Jason E. Ransom; Ransom/Silvester, PLC, on brief), for appellant.
Appellant submitting on brief.

Kimberly A. Hackbarth, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of the City of Winchester convicted Demetrius

Dominique Brown of first-degree murder, attempted robbery, conspiracy to commit robbery,

aggravated malicious wounding, and use of a firearm in the commission of a felony. By final

order entered on March 8, 2024, the circuit court sentenced him to life imprisonment plus 73

years with 45 years suspended. Brown now appeals, asserting that the circuit court abused its

discretion by declining to strike Juror 31 for cause. He also challenges the sufficiency of the

evidence. For the following reasons, we hold that the circuit court did not commit reversible

error, and we affirm Brown's convictions.[1]

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The final sentencing order erroneously states that Brown was convicted of robbery
resulting in death and bank robbery, rather than attempted robbery and conspiracy to commit
robbery. We find that these mistakes are clerical errors, and we remand to the circuit court for
the limited purpose of correcting the final sentencing order. *See* Code § 8.01-428(B) (governing
correction of clerical errors by the circuit court).

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

I. Jury Selection

A grand jury charged Brown with first-degree murder, attempted robbery, conspiracy to commit robbery, aggravated malicious wounding, and use of a firearm in the commission of a felony. Brown exercised his right to a jury trial. During voir dire, the circuit court asked a group of panelists whether they "kn[ew] anything about this case." Along with several others, Juror 31[2] answered affirmatively, stating that she "had read about it in the newspaper." The circuit court asked if any panelist had "formed or expressed an opinion about the guilt or the innocence of the [d]efendant based on what you have read or what you may have heard?" All answered in the negative.

The prosecutor subsequently told the panelists that this case would involve "graphic" evidence, including body camera footage and autopsy photos. She then asked if any "member of the panel" was "so shocked and disturbed with such imagery that" they "believe[d] that" they could not "render a fair decision based on the evidence." Juror 31 gave a response that was inaudible to the court reporter. The prosecutor thanked Juror 31 for her response and stated that they would "talk about it later."

---

[2] We use the juror number, rather than name, to protect the privacy of the panelist.

During individual voir dire, Juror 31 elaborated that she "could probably see the pictures." But she stated that "the nature of the whole case" would "make [her] anxious." Juror 31 also explained that the FBI once investigated a transaction she participated in as a bank teller. The Commonwealth then asked if there were "any other reasons today that would make [her] feel [she] couldn't be fair or impartial to each side?" Juror 31 responded, "No."

In response to defense counsel's questions, Juror 31 stated that, as a daily reader of the local newspaper, she likely had read all of that publication's articles about this case. She did not form any opinions about the case other than that it was "a sad state of affairs that" the underlying events "happen[ed] in the community." Juror 31 further stated that she probably told her husband that "it happened"; her husband did not "express any opinions to" her "about what [she] told him."

Defense counsel further addressed Juror 31's earlier statements about her anxiety regarding the case. Juror 31 stated that she did not watch television shows like Law and Order and Blue Bloods. Similarly, books about murder or mystery were "not [her] cup of tea." Defense counsel asked if this could "affect [her] ability to hear this case?" She responded: "I am going to be very anxious about listening to this case[,] yes." When asked if she would "prefer not to sit on this jury," Juror 31 replied, "Probably, yes. I would rather not." Notably, neither side asked whether the anxiety or the desire not to sit on the jury would affect her ability to listen to the evidence with an open mind and give both sides a fair trial.

Brown moved to strike Juror 31 for cause, citing the "overall nature of this case." He asserted that Juror 31 "trie[d] to avoid things like this" and would be anxious while "listening to the evidence." Brown further claimed that Juror 31's "analysis" would be "fueled [by] emotion and

anxiety." The Commonwealth opposed the motion, noting that Juror 31 never stated that she could not be fair and impartial. The circuit court declined to strike Juror 31 for cause.[3]

II. Evidence at Trial

Brown and Z.D.[4] agreed over text message that Z.D. would sell Brown marijuana in Winchester on May 21, 2021. On the afternoon of May 21, 2021, Jaedan Smithers drove Brown and Tony Peyton Jr., from Fredericksburg to Winchester in his mother's white Honda sedan. Z.D. asked Brown to meet him at the basketball courts of a local elementary school to make the transaction. Z.D. and his friends, J.M. and K.G., went to the basketball courts later that afternoon but Brown subsequently messaged Z.D. that he did not want to do the sale there.

After Brown "said he wasn't coming to the basketball courts," Z.D., J.M., and K.G. returned to the Orchardcrest apartment complex where Z.D. lived with his mother. When they arrived, Brown was waiting outside the Honda. Seeing Brown near his residence made Z.D. "really uncomfortable," but Brown stated that he still wanted to "go through with the deal." J.M.'s and K.G.'s presence made Z.D. feel "a little more secure," and he ultimately invited Brown into his residence. Smithers and Peyton remained in the Honda. Z.D.'s friends Veronica Dove and Damien McPeek sat in a different vehicle in the parking lot.

Z.D., J.M., K.G., and Brown then entered Z.D.'s second-floor unit and went to Z.D.'s bedroom. After "chatting" briefly, Z.D. asked Brown for "the money." Brown then "pulled the gun out" and said, "Don't fucking move." When J.M. "started to nudge up," Brown pointed the weapon at him and repeated, "I said don't fucking move." Z.D. then stated, "You are going to have to kill me to take that shit."

---

[3] Brown ultimately removed Juror 31 with a preemptory strike.

[4] We use initials, rather than names, to protect the privacy of the minor victims.

Z.D. struggled with Brown as J.M. and K.G. ran for the bedroom door. Brown fired a shot that struck J.M. in the head. K.G. had reached the hall outside the bedroom when he heard the shot. Z.D. stopped struggling and curled into ball, believing that Brown was going to kill him. Brown then shot Z.D. in the hip.

K.G. was in the kitchen when he heard the second shot. He exited the apartment and ran to his own residence. Brown fled from the residence shortly after K.G. Brown returned to the Honda, and it sped away. After Dove saw K.G. and Brown run from the apartment, she pulled her vehicle next to the entryway and McPeek ran upstairs. Z.D. called 911, and McPeek helped him down the stairs and out of the building.

Winchester police officers arrived on scene, and although they attempted to help J.M., he died at the scene. The autopsy confirmed that J.M. died from a gunshot wound to the head. Emergency personnel transported Z.D. to the hospital, where he underwent surgery, including the removal of a portion of his large intestine. The police found two shell casings in the bedroom and a bag of marijuana on Z.D.'s bed.

At trial, Z.D. testified that he had thought that Brown "was a little shady" and "might try and rob" him during the planned marijuana transaction on May 21, 2021. Z.D. explained that he wanted to conduct the sale at the basketball courts because it was "harder to . . . rob someone out in broad daylight." Z.D. also asked a friend to bring a firearm to the basketball courts as a "precaution[]." Although Z.D. believed that his friend brought the firearm to the basketball courts, Z.D. averred that he never saw it.[5]

Z.D. testified that he remembered only "bits and pieces" of what occurred inside his bedroom that day. He recalled Brown "pulling a gun out," "racking the slide," and pointing it at

---

[5] K.G. testified that there was a pistol "being passed around" at the basketball courts but that he did not "know who it belonged to."

him and J.M. Z.D. then made a "split[-]second decision" to tackle Brown to protect himself and his friends. He "scuffle[d]" with Brown but subsequently "remember[ed] letting him get up and then curling up into a ball." Based on his memories, he believed that he did so because Brown had shot J.M. On cross-examination, Brown attempted to impeach Z.D.'s credibility with allegedly inconsistent statements he made during his preliminary hearing testimony.

K.G. testified that after he fled from Z.D.'s apartment, he ran to his own residence. Police officers later arrived and took him to the police station. K.G. admitted on the stand that he initially lied to the police and denied being present at Z.D.'s apartment during the shooting. He testified that he lied because he was "on house arrest" for "stealing guns." After the officers informed K.G. that J.M. had died, K.G. "broke down" and "decid[ed] to cooperate." But K.G. acknowledged that, even after he decided to cooperate with the police, he falsely told them that he, Z.D., and J.M. sought to buy marijuana from Brown rather than sell it.

K.G. averred that he was not "getting anything in exchange" for his testimony. But he acknowledged that he was placed in the "Post-D" program regarding his juvenile sentence "in part" because he cooperated with the Commonwealth. He explained that he "told the whole truth" at trial because it was what had "to be done."

Brown also sought to impeach K.G. with alleged inconsistent statements from his preliminary hearing testimony. K.G. averred that he did not recall telling Detective Thurman that Brown and Z.D. had been "beefing" because Brown owed Z.D. money. K.G. acknowledged writing Z.D. a letter from jail stating that Z.D. "should take this experience as a life lesson." K.G. denied that he meant that Z.D. should not have tried to rob Brown. Further, he denied that he, Z.D., and J.M. ever discussed robbing Brown.

Smithers testified that he drove Brown and Peyton from Fredericksburg to Winchester on May 21, 2021, "[t]o help" Brown "with a robbery." Smithers did not know the anticipated victims personally but understood that Brown intended to steal marijuana from them.

The Commonwealth showed Smithers the text messages he exchanged with Brown between May 15 and May 21, 2021. Smithers identified and explained the texts related to the planned robbery. When Smithers asked Brown for gas money for the trip from Fredericksburg to Winchester, Brown replied that Smithers was "part of this move" and needed "to figure out that part on [his] own." Smithers testified that "move" meant robbery. Smithers also informed Brown that he would be "mad if [they] ma[de] this drive" and Brown did not "get [anything]."

Smithers testified that when he drove Brown and Peyton to Winchester on May 21, 2021, Brown did not bring any money. Once in Winchester, Smithers drove to the basketball courts and then to Orchardcrest. When Z.D., J.M., and K.G. arrived two minutes later, they asked if Brown "still want[ed] to buy the weed." Brown said, "Yeah," and the four entered Z.D.'s apartment. Smithers and Peyton sat in the car and listened to music.

When Smithers saw K.G. run out of the apartment, he pulled the Honda in front of the building. Brown then ran out holding a firearm, entered the Honda, and said "[j]ust go." During the return trip to Fredericksburg, Brown told Smithers and Peyton that the "victim group had tried to jump him."

Smithers identified his voice on a recorded jail call with Brown. Smithers testified that Brown's plan had been to tell the police that he "did not go in there with a gun," but rather found it under Z.D.'s bed. But Smithers informed Brown during the call that "they already knew that you went in there with a gun." Smithers explained that he had tried to help Brown because they were "friend[s] at the time."

Smithers told the jury that he was a "different person" than "before [he] was incarcerated" on charges in this case. He stated that he did not have "any type of plea deal" with the Commonwealth but did "expect to receive some type of leniency for [his] cooperation."

On cross-examination, Smithers acknowledged that he had been incarcerated since August 2021. He agreed that he had been charged with first-degree murder, conspiracy to commit robbery, attempted robbery, and aggravated malicious wounding, and faced a potential life sentence. He admitted that he falsely told the police that Brown threw a firearm out of the car on the drive back to Fredericksburg. Smithers denied telling an investigator working for Brown's previous counsel that he had gone to Winchester that day to "see a girl."

At the close of the Commonwealth's case, Brown moved to strike the evidence, arguing that the Commonwealth's witnesses were inherently incredible. The circuit court denied the motion.

Brown testified in his own defense. According to Brown, he considered Z.D. his friend and stated that they shared similar interests. Brown stated that he had purchased marijuana from Z.D. on several occasions, beginning when Brown lived in Winchester. Brown continued to buy marijuana from Z.D. after moving to Fredericksburg because Z.D. sold "good quality weed," compared to the "horrible" quality of marijuana available in Fredericksburg.

Brown denied that he ever intended or attempted to rob Z.D. or J.M on May 21, 2021. He claimed that when he went to Winchester to meet Z.D., he brought $450 in his cross-body bag along with a Taurus nine-millimeter handgun. He explained to the jury that he always caried a firearm for protection.

According to Brown, he, Smithers, and Peyton went to the basketball courts but did not see Z.D., J.M., or K.G. there. Brown grew uncomfortable, and Smithers drove back to Orchardcrest. Z.D., J.M., and K.G. arrived there a minute or two later. Brown asked Z.D. if they were "still good to go," and Z.D. replied, "Yeah, come upstairs." Brown then followed Z.D., J.M., and K.G. into

Z.D.'s apartment. Brown told the jury that he felt comfortable going with the three of them by himself because of his good relationship with Z.D.

Inside Z.D.'s bedroom, Z.D. sat at his desk, J.M. sat on the bed, and Brown and K.G. stood. Z.D. asked if Brown "ha[d] the money." Brown said, "Yeah," and asked if Z.D. "ha[d] the weed." As Brown reached into his bag for the money, J.M. punched him in the jaw. J.M. then hit Brown in the back of the head, and he stumbled toward Z.D.

According to Brown, Z.D. tackled him. Brown tripped over the corner of the bed and Z.D. "land[ed] on top of" him. Brown drew his firearm from the bag with his left hand and held it "far away from" Z.D. so he could not take it. Then Brown saw J.M. "turn back around and lift his foot in the air as if he was going to stomp on" Brown's face. Brown "immediately just reacted and . . . pulled the trigger."

Brown said that "even though the first shot went off," Z.D. "didn't give up." So Brown "just pulled the gun in and used it to defend himself against" Z.D. Brown then "literally used all the strength [he] had left and pushed" Z.D. off him, "got up[,] and ran." He told the jury that he "was in fear of serious bodily harm" when he fired the shots, believing that Z.D. and J.M. "would use the gun against [him] and probably kill [him] with it." Brown felt "it was absolutely necessary to shoot" Z.D. in the hip because "he didn't acknowledge the first shot," and Brown believed that he "was still trying to take the gun" and "use it against" Brown.

Brown testified that he ran out of the apartment to the car and told Smithers and Peyton that "they tried to jump" him. But he did not tell Smithers and Peyton that he had fired two shots until they arrived at Peyton's apartment in Fredericksburg. Brown explained to the jury that his "thoughts [were] . . . jumbled" because he was "shocked" and "devastated." He did not learn that J.M. had died until Peyton sent him a news article. Brown felt "[c]ompletely crushed" to know that he had killed J.M.

On cross-examination, Brown acknowledged that he was a member of the Rollin' Sixties Crips gang. He also admitted that he originally intended to falsely tell the police that he found the firearm under Z.D.'s bed. Further, Brown gave the Taurus firearm to a friend several days after the killing rather than surrendering it to the police. He reiterated that he fired the shots because he believed that he was "facing death."

After the close of all the evidence, Brown renewed his motion to strike, arguing that his testimony was "clearly credible" and established that he "didn't try to rob anybody and he was just defending himself." The circuit court again denied the motion, noting that the jury was entitled to determine the credibility of the witnesses. The jury convicted Brown on all counts.[6] Brown appeals.

ANALYSIS

I. Juror Impartiality

The Sixth Amendment of the United States Constitution and Article 1, Section 8 of the Constitution of Virginia "grant[] criminal defendants the right to trial by an impartial jury." *Fields v. Commonwealth*, 73 Va. App. 652, 666 (2021). An accused's constitutional right to trial by an impartial jury is "reinforced by legislative mandate and by the Rules of this [C]ourt." *Castillo v. Commonwealth*, 70 Va. App. 394, 422 (2019) (quoting *Justus v. Commonwealth*, 220 Va. 971, 975-76 (1980)). "It is the duty of the trial court, through the legal machinery provided for that purpose, to procure an impartial jury to try every case." *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 60 (2011) (quoting *Salina v. Commonwealth*, 217 Va. 92, 93 (1976)).

---

[6] The circuit court instructed the jury on first-degree murder under the theory of felony murder. *See* Code § 18.2-32 ("Murder . . . in the . . . attempt to commit . . . robbery . . . is murder of the first degree."). Although the circuit court instructed the jury on self-defense regarding the aggravated malicious wounding charge, the parties and the circuit court agreed that Brown could not assert self-defense regarding felony murder.

In a felony case, 12 "persons from a panel of not less than 20 shall constitute a jury." Code § 19.2-262(B). "The [circuit] court and counsel for either party . . . have the right to examine under oath any person who is called as a juror," and if it "appear[s] to the court that [a] juror does not stand indifferent in the cause," the court must exclude that juror from the panel. Code § 8.01-358; *see* Rule 3A:14. After the circuit court removes jurors for cause, "[t]he parties or their counsel, beginning with the attorney for the Commonwealth, shall alternately strike off one name from the panel until the number remaining shall be reduced to the number required for a jury." Code § 19.2-262(C).

"[T]he test of impartiality is whether the venireperson can lay aside [any] preconceived views and render a verdict based solely on the law and evidence presented at trial." *Lovos-Rivas*, 58 Va. App. at 61 (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 761 (2000)). Additionally, "[t]he right of an impartial jury requires that the jury be capable of understanding the factual issues that it must resolve." *Mason v. Commonwealth*, 255 Va. 505, 509 (1998).

"Juror impartiality is a question of fact." *Goodwin v. Commonwealth*, 71 Va. App. 125, 136 (2019). This Court will not disturb the circuit court's factual finding regarding a juror's impartiality "unless it is plainly wrong or without evidence to support it." *Id.* (quoting *Sheppard v. Commonwealth*, 250 Va. 379, 387 (1995)). We "must give deference to the trial court's decision whether to exclude or retain a prospective juror because the trial court 'sees and hears the juror.'" *Id.* (quoting *Weeks v. Commonwealth*, 248 Va. 460, 475 (1994)). This is because trial judges sit in a superior position than reviewing courts when it comes to observing a witness (or here, a panelist) and the physical details such as body position, emotive expressions, and gestures made while answering questions or making statements. *See Keepers v. Commonwealth*, 72 Va. App. 17, 44 (2020) (recognizing that "a trial judge who personally observes a juror, including the juror's tenor, tone, and general demeanor, is in a better position than an appellate

court to determine whether a particular juror should be stricken"). In assessing a panelist's impartiality, we review the voir dire of the juror "as a whole, not just isolated statements by that juror." *Goodwin*, 71 Va. App. at 136. "[A] trial court's refusal to strike a juror for cause will not be disturbed on appeal unless that decision constitutes 'manifest error amounting to an abuse of discretion.'"[7] *Id.* (quoting *Lovos-Rivas*, 58 Va. App. at 61).

We reject Brown's assertion that the circuit court abused its discretion by declining to strike Juror 31 for cause because she "disclosed her bias and preference not to sit on the jury." Juror 31 forthrightly explained that she would prefer not to sit on this jury because she anticipated that hearing the evidence would make her anxious. But Juror 31 did not say that her anticipated anxiety about serving on the jury in this case would prevent her from rendering a verdict based solely on the law and evidence. *See Lovos-Rivas*, 58 Va. App. at 61. Nor did she express any preconceived views or opinions about the parties or the merits of the case. At the end of the Commonwealth's individual voir dire of Juror 31, the prosecutor asked if there were "any other reasons today that would make [her] feel [she] couldn't be fair or impartial to each side." She answered, "no."

Brown argues that because the prosecutor's question included the word "other," Juror 31's answer "indicat[ed] that the nature of the pictures would affect her ability to be fair and impartial." We disagree. "Proof of a prospective juror's impartiality 'should come from him and not be based on his mere assent to persuasive suggestions.'" *Bradbury v. Commonwealth*, 40 Va. App. 176, 181

---

[7] Juror 31 did not sit on the panel because Brown removed her with a preemptory strike. As the Commonwealth acknowledges, we have rejected the proposition that a circuit court's erroneous failure to strike a panelist for cause is harmless if one of the parties uses a preemptory strike to remove that juror from the panel. *Winston v. Commonwealth*, 32 Va. App. 864, 869 (2000). "[T]he 'statutory requirements for impaneling jurors are mandatory,'" and "any 'departure from a strict observance of the statutory provisions,' when done 'over the protest of the accused . . . constitutes reversible error.'" *Id.* (second alteration in original) (first quoting *Kennedy v. Commonwealth*, 168 Va. 721, 726 (1937); and then quoting *Elkins v. Commonwealth*, 161 Va. 1043, 1047 (1933)).

(2003) (quoting *Breeden v. Commonwealth*, 217 Va. 297, 300 (1976)).  The weight Brown places on one word in one question asked by an attorney during jury selection highlights the importance of this Court's deference to the circuit court's fact-finding.  The circuit court—not this Court—had the opportunity to observe Juror 31's answer to this question in the context of the entire voir dire.  Indeed, the circuit court is in the best position to observe a juror's reactions to questions in real time, taking note of their affect, including, but not limited to, body language, voice changes, eye contact, and any outward expressions of emotion.  In that capacity, the circuit court was not required to find that Juror 31's answer was affirmative evidence of bias.  Indeed, placed in proper context, the circuit court could have found that her answer evinced a lack—rather than the presence of—bias.  Moreover, defense counsel could have, but did not, ask follow-up questions to clarify the meaning of Juror 31's answer.

In sum, the circuit court's determination that Juror 31 could be fair and impartial, notwithstanding her reluctance and anxiety about serving, was not an abuse of discretion.  Thus, there is no basis for this Court to disturb that determination on appeal.

II.  Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)).  "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193

(2009)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"  *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Brown asserts that the evidence is insufficient to support his convictions "because the Commonwealth's witnesses were inherently incredible as a matter of law."  He contends that Z.D., K.G., and Smithers all had motives to lie at trial and that portions of their testimony were inconsistent with each other and their own prior statements.  He claims that, by contrast, his was "[t]he only testimony that was consistent and made sense."  Thus, he contends, "it was obvious" that Z.D., J.M., and K.G. "tried to rob" him, and he "simply defended himself."

"[D]etermining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify."  *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).  "Thus, this Court must accept 'the [fact finder's] determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'"  *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)).  "[W]e may only disturb the trial court's credibility determination if the evidence is 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'"  *Lopez v. Commonwealth*, 73 Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)).  "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable [people] ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ.'"  *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

We reject Brown's contention that Z.D.'s, K.G.'s, and Smithers's testimony all were inherently incredible. Nothing about their testimony was "so contrary to human experience as to render it unworthy of belief." *Lopez*, 73 Va. App. at 84. The Commonwealth's witnesses presented one version of the relevant events; Brown presented a conflicting version in his testimony. It was the jury's duty to decide which version to believe.[8]

Brown contends that Z.D., K.G., and Smithers had motives to lie and were impeached by alleged prior inconsistent statements. All these factors were proper fodder for cross-examination and closing argument. But the fact that Brown attempted to impeach the credibility of the Commonwealth's witnesses "does not necessarily render [their] testimony unworthy of belief." *Juniper*, 271 Va. at 415. Rather, "[t]his circumstance is appropriately weighed as part of the entire issue of witness credibility, which is left to the [fact finder] to determine." *Id.*; *see Ray v. Commonwealth*, 74 Va. App. 291, 306 (2022) ("[T]he mere fact that a witness' testimony may have been impeached does not necessarily render the testimony inherently incredible."). The fact that Brown's own testimony conflicted with that of the Commonwealth's witnesses also does not render their testimony inherently incredible. Instead, the jury was entitled to consider Brown's own motive to lie and to reject his self-serving testimony. *See Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022).

Accordingly, the testimony of the Commonwealth's witnesses was not inherently incredible. Thus, the jury was entitled to credit each witness's testimony as it deemed appropriate. Viewed in the light most favorable to the Commonwealth, the evidence amply supports Brown's convictions.

---

[8] "Determining the credibility of witnesses . . . is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)).

The undisputed testimony at trial—including Brown's—established that he fatally shot J.M. and seriously wounded Z.D. inside Z.D.'s bedroom on May 21, 2021. Smithers testified that he drove Brown to Winchester on May 21, 2021, so that Brown could rob Z.D. and his companions of marijuana. Specifically, Smithers averred that, even though Brown told Z.D. that he wished to purchase marijuana that day, Brown did not bring any money with him to Winchester.

K.G. testified that after he, Z.D., J.M., and Brown entered the bedroom, Brown drew his firearm and ordered them not to move. Although Z.D.'s memory had gaps, he likewise remembered Brown "pulling the gun out," "racking the slide," and pointing it at him. After Z.D. struggled with Brown, Brown shot J.M. Z.D. curled into a ball, believing that Brown was going to kill him. Brown then shot Z.D. in the hip, causing extensive injuries requiring surgery, including removal of a significant piece of his intestine.

A jury viewing this testimony in the light most favorable to the Commonwealth could conclude that Brown conspired and attempted to rob Z.D. and that he killed J.M. during that robbery. Likewise, it could conclude that Brown committed aggravated malicious wounding against Z.D. and used a firearm in the commission of those felonies. Therefore, the circuit court properly denied Brown's motions to strike.

CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment and remand for the correction of clerical errors in the sentencing order.

*Affirmed and remanded.*